[No. S045423. June 23, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
EDGARDO SÁNCHEZ, Defendant and Appellant.

**Counsel**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Sara Theiss, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**CHIN, J.**—A jury convicted defendant, Edgardo Sánchez, of the first degree murder of Officer John A. Hoglund under the special circumstances of murder to prevent arrest, murder of a peace officer, and murder in the commission of

robbery; of the first degree murder of Lee Chul Kim under the special circumstance of murder in the commission of robbery; of the attempted murder of Luis Enrique Medina; and of 26 counts of robbery, two counts of attempted robbery, five counts of assault with a deadly weapon, and two counts of assault with a stun gun. The jury also found true the special circumstance allegation of multiple murder and that defendant personally used a firearm as to many, although not all, of the counts. After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed a judgment of death. This appeal is automatic. We reverse one robbery count, modify the determinate prison sentence accordingly, and otherwise affirm the judgment.

## I. The Facts

### A. Guilt Phase

#### 1. Overview

Defendant and several cohorts, usually including his two codefendants, Jose Contreras and Benjamin Navarro, committed seven separate takeover-style armed robberies of business establishments from December 1991 to May 1992.[1] During one robbery, defendant and Contreras shot the store owner to death. During another robbery, defendant applied a stun gun to two victims to try to coerce one of them to unlock a safe. While leaving the scene of the final robbery, defendant shot to death a police officer responding to a silent alarm.

Videotape containing images of all three defendants captured portions of the last robbery. Numerous eyewitness identifications and other evidence also connected defendant to the crimes.

At trial, defense counsel conceded that defendant was involved in some of the robberies, and that the videotape of the final robbery showed defendant committing it. But he argued there was a reasonable doubt about his involvement in some of the robberies and about his guilt of some of the specific crimes.

#### 2. Prosecution Evidence

##### a. Outrigger Lounge

During the evening of December 31, 1991, the Outrigger Lounge in Sun Valley was crowded with customers preparing to celebrate the New Year.

---

[1] Contreras and Navarro were convicted of many of the same crimes. They did not receive the death penalty and are not involved in this appeal.

Around 8:00 p.m., at least three men entered the lounge and, at gunpoint, ordered the customers to go to the floor. The gunmen spoke English with a Hispanic accent.

One gunman, identified as defendant, wielded a short shotgun. He jumped over the bar, knocking down the bartender, Robert Lehman, in the process. Pointing his shotgun at Lehman, defendant took Lehman's wallet, watch, and money clip. He also took around $410 from the cash register. Defendant then forced Lehman to go to the office, where defendant took about $800 from the safe.

The perpetrators also took property at gunpoint from customers Walter deWitt, Margaret Tucker, Eugene Engelsberger, Praneet Gallegos, Marjorie Livesley, Lois Skinner, and Dennis Sorenson. The owner of the lounge, Jeannette Luettjohann, testified that the gunmen took about $1,600 in cash and $125 to $130 worth of food. One gunman hit John Tucker, Margaret's husband, with the butt of a shotgun, breaking two ribs.

Anne Pickard, Sorenson's girlfriend, who was in the restroom when the robbery began, came out in time to see people on the floor. She later identified defendant as the man with the short shotgun. She had previously identified him from photographic and live lineups with differing degrees of certainty. Barbara Salazar, an employee, tentatively identified defendant from a photographic lineup as one of the gunmen. Engelsberger identified defendant from a photographic lineup. Gallegos identified defendant as the man with the shotgun in court and from a photographic lineup. Some witnesses identified Contreras and Navarro as gunmen with various degrees of certainty.

Livesley identified a gold chain found on defendant's person when he was later arrested as one that had been taken from her during the robbery.

For this incident, defendant was convicted of robbing Margaret Tucker, Eugene Engelsberger, Praneet Gallegos, Jeanette Luettjohann, Marjorie Livesley, Lois Skinner, Robert Lehman, and Walter deWitt, and of assaulting John Tucker with a deadly weapon.

b. *El 7 Mares Restaurant*

On the evening of April 18, 1992, around 8:00 p.m., as many as six armed men invaded the El 7 Mares Restaurant in Los Angeles. All were speaking Spanish; some witnesses said they had Central American accents. One perpetrator, holding a shotgun, told two others to "[t]ake care of the guard." The men took private security guard Rene Aguilar's equipment, including his handcuffs, and later led him at gunpoint to the kitchen area. A gunman

entered the office of Magdaleno Urrieta, the restaurant manager, and forced him to turn over $5,000 to $5,500 in cash. The gunmen then forced customers and employees, including Urrieta, into the kitchen and told them to lie facedown on the floor.

The gunmen took a watch and about $200 from customer Nelson Hernandez and about $8,000 worth of jewelry from his wife; money from the cash register; around $290 from waitress Lupe Guizar; and a watch, chain, wedding ring, and wallet containing about $80 from Urrieta.

Aguilar and Guizar identified defendant and his codefendants as among the gunmen. Aguilar described defendant as short and Contreras as tall.[2] Nelson Hernandez identified Navarro as one of the gunmen; he identified a watch found in a residence linked to defendant as similar to the watch taken from him. Aguilar's handcuffs were later found in Navarro's home.

For this incident, defendant was convicted of robbing Magdaleno Urrieta, Nelson Hernandez, Lupe Guizar, and Rene Aguilar.

### c. *Mercado Buenos Aires*

On April 24, 1992, around 5:25 p.m., at least four gunmen invaded the Mercado Buenos Aires supermarket in Van Nuys. One gunman said, "This is a robbery. Hands upon your head." Witnesses said the men spoke Spanish with what sounded like a Central American accent.

The store owner, Manuel Rodriguez, observed one gunman grab a well-dressed customer by the hair and, apparently believing the customer was the owner, tell him, "You're going to show us where the money is." Manuel told the gunman to leave the customer alone, as he, Manuel, was the owner. A gunman took Manuel into the store office and demanded that he give him money. Manuel turned over cash, checks, and food stamps worth about $3,000 and told the gunman there was no more money. Manuel's wife, Clelia Rodriguez, was brought into the office with a gun pointed to her head. One gunman told another to cut off one of her fingers to force Manuel to say where the rest of the money was. The gunman also threatened to kill her if Manuel did not say where more money was. Manuel responded that there was nothing else but to take what they wanted.

Eventually, the gunmen herded Manuel, Clelia, their son Paul, a customer, and two employees, Dario de Luro and Arturo Flores, into a back bathroom.

---

[2] Throughout the trial, witnesses generally identified defendant as the shortest and Contreras as the tallest of the gunmen.

Manuel Rodriguez testified that the gunmen took his chain and wedding ring, Clelia's chain and bracelet, and de Luro's wallet and watch. He believed they took wallets and watches from others before they entered the bathroom. Paul Rodriguez testified that the gunmen took his necklace and ring and a wallet from de Luro.

Manuel Rodriguez identified defendant from photographic and live lineups and at trial as the man who pointed the gun at his wife. He identified Contreras as the gunman who threatened to cut off Clelia's finger and, with less certainty, Navarro as another gunman. He testified that defendant and Contreras seemed to be giving the orders. Paul Rodriguez identified defendant from photographic and live lineups and at trial as the gunman giving the orders. With less certainty, he identified Contreras as another of the gunmen. Manuel and Paul identified a necklace and a bracelet found on defendant's person when he was later arrested as similar to items taken during the robbery.

For this incident, defendant was convicted of robbing Manuel Rodriguez, Paul Rodriguez, Clelia Rodriguez, Arturo Flores, and Dario de Luro.

### d. *Woodley Market*

On the morning of May 4, 1992, around 9:35 a.m., three or four gunmen entered the Woodley Market, a food store in Van Nuys. Owner Lee Chul Kim had just returned from the bank carrying cash in a brown leather bag. One gunman approached employee Victor Cisneros, pointed a gun at him, and forced him to go to the back of the store and lie down. The gunman spoke Spanish with what Cisneros described as an "El Salvadoran" accent. Another gunman approached Teresa Torres, a cashier, and told her not to touch anything.

Employee Guillermo Galvez observed Kim running from a gunman, identified as defendant, who was following Kim and pointing a handgun at him. While he was running, Kim dropped the money bag and the keys to the store cash drawer. Employees Eduardo Rivera and Galvez observed Kim, followed by defendant, run to the meat freezer and try to close the door.[3] Rivera heard Kim say something that sounded as if he was "in fear, like [he was] terrorized." As defendant attempted to and eventually succeeded in opening the freezer door, Galvez heard Kim crying "please don't do anything to me," and saying "that the keys were here and he would give them everything." Cisneros heard Kim, with fear in his voice, say, "Okay, Okay,

---

[3] Rivera was unavailable to testify at trial, so his preliminary hearing testimony was read to the jury.

please, please, okay." He heard another voice say, in Spanish with a Salvadoran accent, "The keys, the keys." Torres could not see Kim, but she, as well as Rivera, heard him say, "Please, please." Galvez and Rivera saw defendant hit Kim in the neck with the gun. When Galvez last saw Kim alive, he was on his knees in the freezer.

Gunfire erupted from the freezer area. Galvez observed defendant and Contreras fire at Kim. He estimated he heard around 10 gunshots from two different guns. Defendant shot downwards at Kim. Cisneros heard the sound of a gun being dropped, then he looked and observed a hand pick up a gun. A voice said, "Let's go." The men then ran past Cisneros and out of the store.

Kim was shot eight times by two different guns. Six of the shots alone would have been fatal or potentially fatal. Evidence indicated that Kim managed to get off some shots of his own from a .25-caliber semiautomatic handgun that he carried on his person. His empty holster, but not his gun, was found in his pocket.

Cisneros and Galvez identified defendant at trial as one of the gunmen. Rivera identified defendant at the preliminary hearing with "95 percent" certainty and identified him earlier at a live lineup. Cisneros, Torres, and Rivera also identified Contreras.

For this incident, defendant was convicted of the attempted robbery and first degree murder of Kim under the special circumstance of murder in the commission of robbery. The jury found him not guilty of attempting to rob Galvez and Rivera.

### e. Casa Gamino

Armando Lopez was the manager, and Maricella Mendoza a hostess, at the Casa Gamino Restaurant in Paramount. Around 9:30 p.m. on the evening of May 17, 1992, several gunmen entered the restaurant. One gunman grabbed Mendoza by the hair, pointed a gun at her, and took her to the kitchen, where one of the gunmen demanded she open a cash register. When she could not open it because she was nervous, a man slapped her. Gunmen took other employees, including Armando's brothers, Arturo and Javier Lopez, and Esequiel Flores, to the kitchen area, where they robbed them and Mendoza of jewelry and other property.

Another gunman, identified as defendant, placed a gun against Armando's stomach, and took him to the back. During these events, defendant sometimes spoke English and sometimes Spanish with a Central American accent. Defendant displayed what looked like a stun gun and said to Armando, "I'm

going to kill you with this if you say anything." Defendant then forced him into the office and demanded money. He took the money that was in the office, around $20,000.

In the office, defendant demanded that Armando open the safe. Armando did not know the combination and told defendant he could not open it. Defendant slapped him, then shot him with the stun gun two or three times on his ribs and stomach, causing him to scream loudly in pain. Armando testified the gun had "like some blue flames coming out of it." Javier Lopez saw defendant give Armando electric shocks and heard Armando screaming and saying he did not know the combination. Defendant demanded again that Armando open the safe. Armando responded "that I was unable to open the door. I said I had children." In response, defendant placed his gun in his mouth and counted "one, two, three, and he said, 'If you do not open the safe, I'm going to kill you.'"

Another gunman then brought Mendoza into the office. There, as she testified, "They began torturing me in order to make Armando talk." "They had a stun gun, and they were hitting me on my shoulders and my back. And they put the gun inside Armando's mouth. They told him that if he was not going to open the safe . . . , they would kill him and they would kill me as well." When she told them she did not know how to open the safe, defendant hit her in the head with a gun. Being shocked with the stun gun was very painful and caused her to scream. They used it on her about six times, and she could see "blue bolts" coming from it. Both Armando and Mendoza testified that the same man, identified by Armando as defendant, used the stun gun on both of them.

A gunman then took Mendoza to the back and told her "to scream . . . loudly so that Armando would open the safe." He threatened to "put me inside some water that was there, and then he said he was going to use the stun gun to hit me on the heart so that I would die if I didn't scream loud enough." She screamed to Armando to open the safe. Arturo and Javier Lopez heard her scream many times.

Armando was forced to open a cash register. A gunman took $300 to $400 from it. Defendant took Armando's gold bracelet, ring, and watch. Gunmen also took property from Lucia Lopez, Javier's wife. Lucia heard Mendoza screaming from the kitchen area.

Armando, Mendoza, and Javier heard some of the robbers refer to one of the gunmen, identified by Armando as defendant, by the name "Morro." Armando testified that defendant responded to that name. The gunmen then left. Javier estimated that the robbery lasted about 25 to 27 minutes.

Armando identified defendant in court as the man who used the stun gun on him. Previously he identified two photographs from a lineup—one of defendant and one of a nonsuspect—as possibly being the gunman. He also tentatively identified Contreras and Navarro as other gunmen. Mendoza tentatively identified Navarro as one of the gunmen but was unable to identify defendant. Arturo identified defendant as the gunman who was with Armando, and Contreras as another gunman. Lucia and Javier identified defendant as one of the gunmen and had previously identified him from photographic and live lineups. They also identified Contreras. Flores identified Navarro from a photographic lineup as a gunman. Customers Norman and Charlene Busby identified Contreras and Navarro. Customer John Khounthavong, an off-duty police officer, identified Contreras, and customer Raul Ramirez identified Navarro from a photographic lineup.

The stun gun used in the robbery was never found, but an expert testified about the characteristics of stun guns. Unlike a Taser, which can be used from a distance, a stun gun must be applied directly to the person to have an effect. The expert demonstrated the use of a stun gun that witnesses testified looked like the one defendant used. It generated blue sparks and could be used to immobilize a person.

For this incident, defendant was convicted of robbing and assaulting Armando Lopez with a deadly weapon and with a stun gun, of robbing and assaulting Maricella Mendoza with a deadly weapon and with a stun gun, and with robbing Javier Lopez, Esequiel Flores, and Arturo Lopez.

### f. *Ofelia's Restaurant*

Ofelia Saavedra and her husband, Juan Saavedra, owned Ofelia's Restaurant in South Gate. Their daughter, Leticia Saavedra, and Obdulia Garcia also worked in the restaurant.

Around 11:30 a.m. on May 22, 1992, Ofelia observed her husband walking toward the back door followed by a man, identified as defendant, wielding a gun. Around this same time, Leticia was returning from an errand and was entering the restaurant through the back door. Ofelia heard defendant, speaking Spanish, tell Juan to stop. Juan responded by saying, "Let me open the door for my daughter." A struggle ensued between defendant and Juan over the gun. Ofelia, holding a knife, turned to face defendant.

Leticia entered the restaurant in time to observe the struggle. Defendant was threatening to kill Juan, and Juan was saying to let go of the gun. In the struggle, the gun went off twice, firing into the floor. Then a second gunman, identified as Contreras, appeared. Ofelia pointed the knife at Contreras but

dropped it after he threatened to shoot her. Leticia saw Contreras hit her father in the head with his gun at least five times, causing bleeding. Contreras took Ofelia to the dining area, where he took property from Garcia.

After the gunshots, defendant said, "Let's go, the cops are coming," and the gunmen left running. A slip-on black shoe that the parties stipulated belonged to defendant was left behind. The gunmen left in two cars, one red and one blue.

Leticia identified defendant from a live lineup and later in court as the man who struggled with her father. She also identified a photograph of the car defendant was driving when he was arrested as similar to the red getaway car. Ofelia identified defendant in court and Contreras from a photographic lineup.

For this incident, defendant was convicted of assaulting with a deadly weapon and attempting to rob Juan Saavedra, of robbing Obdulia Garcia, and of assaulting Ofelia Saavedra with a deadly weapon.

### g. George's Market

On May 29, 1992, around 1:30 p.m., several gunmen invaded George's Market, a delicatessen in Maywood. Portions of the robbery were captured on a videotape that was played for the jury.

Defendant and Contreras went behind the counter where owner Linda Park and her son Tom Park were standing and, at gunpoint, demanded money. They threatened to kill Tom if he did not reveal where the money was. At one point, defendant slapped him, knocking his glasses to the floor. At another point, defendant pulled the slide of his semiautomatic handgun as though placing a bullet into the chamber. They took about $1,500 from each of two cash registers, around $1,000 worth of food stamps, a few hundred dollars from under the counter, three bundles of $2,000 each, and a handgun the Park family kept behind the counter.

During these events, a gunman robbed employee Gumercindo Salgado, taking $200 to $300 from a cash register. The gunmen left, with defendant the last to leave. Shortly after they left, those inside the store heard gunshots.

The gunmen prevented the Parks from pushing the store's silent alarm button, but Salgado activated the silent alarm in the butcher shop. Two police vehicles responded to the alarm. Officer John Hoglund, wearing a uniform, was alone in the vehicle nearer the scene. Officer Kenneth Meisels and Reserve Officer William Wallace—20 minutes into his first-ever duty shift—

were together in the second vehicle farther away. Officer Hoglund radioed Officer Meisels that he would respond to the alarm and later said he had arrived at the location.

As Officer Meisels neared the store, he observed a red sports car with a dark-tinted back window containing a single occupant speed past and run a stop sign. He tried to pursue it, but it was going too fast. He attempted to contact Officer Hoglund. Receiving no response, he gave up pursuing the car and drove to the scene of the silent alarm. Officers Meisels and Wallace arrived to see Officer Hoglund's police vehicle parked in front of the market with his bullet-riddled body partly inside the car with his legs outside. Officer Hoglund's firearm was in its unsnapped holster.

Erik Sanchez was driving in the area when he saw a police vehicle stop and an officer get out. He heard four to five gunshots and saw the officer fall half in the vehicle. He did not see the shooter but he saw four men run and get into two cars, one of which was a red Mazda RX 7 with a tinted back window. He tried to get the Mazda's license number but could not do so because the numbers were obscured. The Mazda's driver was an Hispanic male.

Luis Enrique Medina testified that he double-parked in front of George's Market that day waiting while a friend went inside the store. He observed a man, who the evidence indicated was Navarro, walking back and forth in front as if watching the store. Some men came out and then went back inside the store. They were speaking Spanish with a Central American accent. Medina observed a police officer turn on the lights of his vehicle, then get out and stand up. Some men came out of the store and started running. The officer told them to stop. The last one out, whom the evidence showed was defendant, passed by Medina's car and pulled out a gun. Medina, a former police officer in Mexico familiar with guns, believed the gun was a black nine-millimeter handgun.

Defendant swore at the police officer and said, "You're going to die." When, as Medina testified, the officer "wanted to pull out his gun and his radio," defendant shot him. The officer was hit in the body and fell. As the officer fell, defendant shot him again, this time in the head.

After shooting the officer, defendant aimed the gun at Medina from about eight feet away. Defendant was looking at Medina with his finger on the trigger. Medina could tell the gun was empty because the slide was open. He testified that defendant "was trying to shoot, but there were no bullets in the gun," and "he made a gesture as to remove the clip that was there."

Defendant's cohorts called and he ran to them. He got into a small red car, and they drove away. Medina was unable to get the license number of the car because something was obscuring it.

Officer Hoglund died of three gunshot wounds, two into the torso (one through the heart), and one through the brain. The positioning of the head wound was consistent with the officer being in the car slumped forward when shot in the head. Each of the gunshots individually would have been fatal. The bullets were consistent with those from a nine-millimeter handgun.

Defendant's image appeared on the videotape. Tom and Linda Park identified him at photographic and live lineups and later at trial, and customer Elvira Acosta identified him from a live lineup and later in court. Witnesses also identified Contreras and Navarro. Officers Meisels and Wallace, and witness Erik Sanchez, testified that the car defendant was driving when he was later arrested was similar to the red car they observed.

Medina was not positive of his identification of defendant in court. He had changed his testimony at the preliminary hearing regarding the identity of the shooter, although he eventually identified defendant. He testified at trial the reason for this was that at the preliminary hearing, he had been "afraid, and I was afraid for my family." But he consistently identified defendant, who was wearing a distinctive striped shirt in the videotape, as the man who shot the officer.

Los Angeles County Sheriff's Deputy Delores Perales, who investigated this case, testified that in her experience with semiautomatic weapons, it is obvious when the gun is empty. A criminalist testified that a magazine of a nine-millimeter semiautomatic handgun can hold from six to as many as 19 bullets. If the slide locks to the rear, that would indicate the gun was out of ammunition.

For this incident, defendant was convicted of the first degree murder of Officer Hoglund under the special circumstances of murder to prevent arrest, murder of a peace officer, and murder in the commission of robbery; of robbing Linda Park, Tom Park, and Gumercindo Salgado; and of the attempted murder of Luis Enrique Medina.

### h. *Uncharged Incident at Rod's Coffee Shop*

Brian Wellman, the manager of Rod's Coffee Shop in Arcadia, observed five men enter the establishment shortly before midnight on November 7, 1990. He offered them a table. He testified that "as they came in, they just were kind of looking around, and I felt very uneasy right off the bat." Two of

the five had some coffee and "took a couple of sips," then the men left the shop without ordering anything else. Shortly thereafter, Wellman observed "that they were all kind of congregated near the back door, and that made me kind of nervous." "They did not seem to be leaving." Wellman observed them standing near a car parked in the driveway facing the street. The car appeared to be "ready to drive away" rather than parked properly in the parking lot. He also observed another vehicle off to the side. Apprehensive that the group was planning a robbery, Wellman called the police.

Sergeant Randy Kirby and Detective Robert Anderson responded. They observed and then stopped an orange Datsun and a silver Honda. Defendant was the driver of the Datsun. The Honda contained a loaded .357 Magnum. The Datsun contained a loaded .22-caliber revolver under the front passenger seat and a loaded .38-caliber revolver under the driver's seat. Next to the handgun under the passenger seat was a functional black stun gun.

The stun gun was booked into evidence but not preserved. Detective Anderson testified that the stun gun was functional and, when activated, emitted blue sparks. Armando Lopez and Maricella Mendoza later identified a stun gun that emitted similar blue sparks as one that "looked like the one" used in the Casa Gamino robbery.

### i. *Other Evidence*

Bullets and bullet casings found at the scenes of the three robberies during which shots were fired—the Woodley Market, Ofelia's Restaurant, and George's Market robberies—were examined. The examination established that a single nine-millimeter gun fired at least some of the shots during each of those robberies. Three different guns—two 9-millimeter handguns and a .25-caliber handgun (possibly victim Kim's gun)—fired shots during the Woodley Market robbery. Three different guns—two 9-millimeter handguns and a .22-caliber handgun—fired shots during the George's Market robbery.

Contreras and Navarro, who originally gave police the name "Hector Reyna," were arrested on May 31, 1992. When Navarro was arrested, he was driving an orange Nissan with 13-year-old Rosa S. as a passenger.

The officer who arrested Navarro also observed a red Mazda believed to be involved in the robberies. Later the same evening, he stopped that car and arrested defendant, the driver. The car's rear license plate number was obscured. Witnesses testified that the car was similar to the red car seen leaving the scene of the Ofelia's Restaurant and George's Market robberies. When he was arrested, defendant had a white sock containing jewelry concealed in his underwear. Witnesses later identified items of jewelry

removed from the sock as similar to jewelry taken in the Outrigger Lounge and Mercado Buenos Aires robberies. When arrested, and as late as his first court appearance, defendant identified himself as "Carlos Antonio Juarez."

The prosecution placed into evidence photographs found in some of the defendants' residences showing the defendants together, sometimes with firearms that witnesses said resembled firearms used in the robberies.

Rosa S. testified that she was with Navarro, whom she knew as "Hector," when he was arrested.[4] Two days earlier, the day of the George's Market robbery, she had been at the house of a friend of Navarro's she knew as "El Morro." She identified defendant in court and from the videotape of the George's Market robbery as the friend. Defendant and Navarro left the house, then returned about an hour later with a large amount of money. Defendant drove the red car he was later arrested in. Later other men, including Contreras, arrived, some with handguns. In Rosa's presence, they divided the money among themselves.

While Rosa S. was still at defendant's house, and in defendant's presence, someone said, "Carlos"—meaning defendant—"shot a cop." Defendant himself said, "I shot a cop." He said he "shot because the officer had gotten in his way." In the same conversation, he also said that "he had already shot like eight or nine people in his country."

### 3. *Defense Evidence*

Los Angeles County Sheriff's Deputy Nicholas Cabrera testified that he interviewed witnesses shortly after the Casa Gamino robbery, at a time when matters were chaotic. Armando Lopez told him he believed one of the robbers, apparently referring to defendant, "was of Mexican descent," and the other robbers came from Central America.

### B. *Penalty Phase*

The prosecution presented evidence that in 1990, defendant was convicted of possession for sale of cocaine base.

Defendant presented substantial evidence in mitigation. He was from Honduras, the youngest of 10 children. His mother, two brothers, and a sister testified about his life in Honduras. He also presented several witnesses who testified that he had embraced religion in jail and would be of help to others

---

[4] Rosa S. could not be located at the time of trial, so her preliminary hearing testimony was read to the jury. The court also admitted a taped statement Rosa had previously made to the police.

in the future. Arturo Talamante, a "Hispanic coordinator of the ministry in prisons," testified that in 25 years, he had found only two people, including defendant, "who have the spirituality that he [defendant] has had." Luke Packel, a Catholic missionary, expressed the opinion that because of the depth of his religious feelings, defendant's "life has completely turned around."

Defendant testified. He discussed his religious conversion in jail. He studied the Bible and "surrendered fully to the learning, to learn more about our Lord." He wrote some Bible studies, hoping they would help others. He said he shot and killed Kim, but only after Kim shot him first. He admitted shooting Officer Hoglund to escape after the robbery. At first he did not feel remorse, but over time, he came to "realize that human life has an infinite value to it," and now he had "the genuine desire to rescue others from their mistakes." He concluded his direct examination by saying that he now knows that "human life has an infinite value to it, and I ask our Lord to grant me the opportunity to prove that to others so that they can once and for all abandon that path and to be saved by our Lord."

## II. DISCUSSION

### A. Jury Selection Issues

#### 1. Denial of Sequestered Voir Dire

Defendant moved the court "to conduct individualized, sequestered death qualification in compliance with *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]." The court denied the motion. Defendant contends the court erred, and that it was required to question the jurors individually about their views on the death penalty. We disagree.

■ "Code of Civil Procedure section 223 provides in part: 'Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases.' That provision, added by initiative (Prop. 115) in 1990, had the effect of abrogating this court's supervisory direction in *Hovey v. Superior Court*[, *supra*,] 28 Cal.3d 1, 80 (*Hovey*) that the death-qualifying voir dire always be conducted individually and in sequestration, i.e., out of the other prospective jurors' presence." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1050 [71 Cal.Rptr.3d 675, 175 P.3d 632].)

Defendant contends the *Hovey* rule is constitutionally compelled. It is not. "The *Hovey* rule was not constitutionally compelled; the electorate was free to abrogate it by initiative statute." (*People v. Brasure, supra,* 42 Cal.4th at p. 1050.) He also contends the court abused its discretion. "Under Code of

Civil Procedure section 223, the trial court retains the discretion to conduct sequestered voir dire if it concludes that collective voir dire would not be practicable." (*People v. Thomas* (2012) 53 Cal.4th 771, 789 [137 Cal.Rptr.3d 533, 269 P.3d 1109].) In this case, the prospective jurors were asked to fill out a detailed questionnaire so they could state their opinions untainted by the other prospective jurors. The court did not abuse its discretion in finding this procedure adequate to ensure a fair jury selection process. (*People v. Watkins* (2012) 55 Cal.4th 999, 1011 [150 Cal.Rptr.3d 299, 290 P.3d 364].)

Defendant argues that, even after filling out the questionnaires, some prospective jurors might have been influenced during voir dire by answers other prospective jurors gave. But "the purpose and effect of the 'group voir dire' requirement of Code of Civil Procedure section 223 would be obviated if nonsequestered questioning were deemed '[im]practicable' because of the speculative concern that one prospective juror's death penalty responses might influence the responses of others in the venire. It is precisely this premise of *Hovey v. Superior Court, supra*, 28 Cal.3d 1, that Proposition 115's adoption of Code of Civil Procedure section 223 was intended to overrule." (*People v. McKinnon* (2011) 52 Cal.4th 610, 634 [130 Cal.Rptr.3d 590, 259 P.3d 1186].) We see no abuse of discretion.

### 2. Prosecutor's Use of Peremptory Challenges

During jury selection, defendant twice objected that the prosecutor exercised peremptory challenges against "Hispanic" prospective jurors for reasons of group bias in violation of his state and federal constitutional rights. (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) He appears to define the group broadly to include anyone who self-identifies as Hispanic or a member of a Hispanic subgroup, or anyone with a Spanish surname. (See *People v. Trevino* (1985) 39 Cal.3d 667, 676, 686 [217 Cal.Rptr. 652, 704 P.2d 719].) Both times, the trial court found that defendant had not made out a prima facie case of discriminatory challenges and denied the objection. Defendant contends the court erred.

### a. Applicable Legal Principles

■ "Both the state and federal Constitutions prohibit the use of peremptory strikes to remove prospective jurors on the basis of group bias. (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie

case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*).)" (*People v. Scott* (2015) 61 Cal.4th 363, 383 [188 Cal.Rptr.3d 328, 349 P.3d 1028] (*Scott*).)

The trial court ruled defendant had not made out a prima facie case of discriminatory purpose on both occasions. It invited the district attorney to state reasons for some of the excusals but did not rule on the validity of those reasons. Under these circumstances, we review the correctness of the court's first stage rulings that defendant had not made out a prima facie case. (*Scott, supra*, 61 Cal.4th at p. 386.) We review those rulings independently where, as here, the trial predated *Johnson v. California, supra*, 545 U.S. 162 (*Johnson*), and it is not clear from the record whether the trial court analyzed the *Batson/Wheeler* motion under *Johnson*'s standard of an inference of discriminatory purpose. (*Scott*, at p. 384.)

■ "Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made [citation], we have observed that certain types of evidence may prove particularly relevant. [Citation.] Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.] A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record (*People v. Box* (2000) 23 Cal.4th 1153, 1189 [99 Cal.Rptr.2d 69, 5 P.3d 130]; see *People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521]) and that necessarily dispel any inference of bias. (*People v. Taylor* (2010) 48 Cal.4th 574, 644 [108 Cal.Rptr.3d 87, 229 P.3d 12]; accord, *U.S. v. Stephens* (7th Cir. 2005) 421 F.3d 503, 518, 516 ['the examination of "apparent" reasons in the record . . . involves only reasons for the challenges that are objectively evident in the record . . .' such that 'there is no longer any suspicion, or inference, of discrimination in those strikes']; cf. *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110 ['refutation of the inference requires more than a determination that the

record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges . . .']." (*Scott, supra,* 61 Cal.4th at p. 384.)[5]

"[A] reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. Although a court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernable on the record' as part of its 'consideration of "all relevant circumstances" ' [citation], the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Scott, supra,* 61 Cal.4th at p. 390.)

Accordingly, we now review independently the totality of the circumstances as they existed when defendant objected to determine whether the trial court correctly ruled that defendant did not make out a prima facie case of discrimination. As we explain, we find no error.

### b. *First Finding of No Prima Facie Case*

During jury selection, the court worked with groups of 18 prospective jurors, 12 of whom would be placed in the jury box and made subject to challenge. When one of the 12 was challenged, another would replace that one and then be subject to challenge. As needed, more prospective jurors would be added to replenish the number to 18.

When defendant made his first *Batson/Wheeler* objection, the prosecution had used two of its first eight peremptory challenges to excuse two of the five Hispanic jurors then available for challenge: P.G. and E.A.[6] Both prospective jurors identified themselves as Mexican-American in their jury questionnaire. The court found no prima facie case but invited the prosecution to state its reasons for the challenges. Because the two prosecutors, Deputy District

---

[5] Defendant cites the recent decision of *Shirley v. Yates* (9th Cir. 2015) 807 F.3d 1090, 1101, which stated that a reviewing court may not affirm a finding of no prima facie case any time the record suggests grounds on which the prosecution might reasonably have made the challenge at issue. This statement is comparable to the language from *Williams v. Runnels, supra,* 432 F.3d at page 1110, quoted in *Scott, supra,* 61 Cal.4th at page 384. *Shirley* and *Williams* appear correct that under *Johnson, supra,* 545 U.S. 162, reviewing courts may not uphold a finding of no prima facie case simply because the record suggests grounds for a valid challenge. But we believe *Johnson* permits courts to consider, as part of the overall relevant circumstances, nondiscriminatory reasons clearly established in the record that necessarily dispel any inference of bias. (*Scott, supra,* 61 Cal.4th at p. 384; see also *U.S. v. Stephens, supra,* 421 F.3d 503 [cited in *Scott*].)

[6] Defendant states that only three Hispanic jurors had been subject to challenge at this point, specifically, E.S., P.G., and E.A. However, the other two, T.M. and M.M., were called into the box and made subject to challenge shortly before the prosecution challenged E.A.

Attorneys Susan Speer and Michael Grosbard, each exercised one of the challenges, each explained the reasons. The court did not evaluate those reasons but simply denied the motion.

Regarding P.G., Grosbard said he "was extremely against the death penalty on the questionnaire. Always, never, never on the questioning. And here in court he said he didn't like it. He ultimately equivocated, but he—his questionnaire showed he was extremely against it. We don't think he could be fair on the issue." Regarding E.A., Speer said she "came from a very disturbed background and indicated she had recent surgery, was on medication. She was abused as a child, indicated she could probably set that aside, but she indicated she also had medical problems from the surgery. She was also very anti-death penalty on the questionnaire."

Exercising two of eight peremptory challenges to excuse two of the five Hispanic prospective jurors then subject to challenge did not itself provide an inference of discriminatory purpose. The prosecution had not excused most or all of the group and did not use a significantly disproportionate number of strikes against that group. Nothing indicates the questioning was desultory.

As defendant notes, the three defendants were Hispanic and the two murder victims were not. But many other victims were Hispanic, including attempted murder victim Medina and the two victims of the particularly vicious assaults with the stun gun at the Casa Gamino Restaurant. Moreover, the evidence the jury was to hear indicated defendants came from Central America. Medina testified he was from Mexico. The jurors could reasonably infer that at least some of the other victims, many of whom testified with the aid of an interpreter, came from Spanish-speaking countries. It is not clear prosecutors would be motivated to excuse prospective jurors who self-identified as Mexican-American in a case involving so many apparently Hispanic victims, including at least one from Mexico. This factor does not support an inference of discriminatory purpose.

Moreover, as initially sworn, the actual jury contained six non-Hispanic African-Americans, five non-Hispanic Whites, and one Hispanic. This suggests that, at the time of the motions, it was not clear that the victims belonged to the group to which a majority of the remaining jurors would belong. It appears none of the victims were African-American. Accordingly, this factor does not support an inference of discrimination.

Additionally, the record clearly establishes nondiscriminatory reasons for the two challenges that dispel any inference of bias. P.G. said he had "never been in favor of the death penalty," and he did not believe "it has been applied in a standard way to the diverse population of offenders." During voir

dire, he indicated he could impose the death penalty "if things are very desperate, very clear that it's not even," because he accepted that it was the law. But he also said that he was not in favor of it and would support "tak[ing] it off the books."

E.A. indicated on the questionnaire that she had been sexually abused as a child and was "recovering from a brain operation for seizure disorder." She was on medication and had her doctor's permission to serve as a juror. She would have "[d]ifficulty" to "judge in terms of the death penalty." Regarding the death penalty, she wrote, "I feel sad that we have the death penalty, life is precious to me. Death penalty is necessary though because of the crime involved. I feel reluctant to be directly involved with a decision regarding the death penalty." She added, "I understand the penalty of death. I do not want to be in a position to make a decision on this penalty." During voir dire, she indicated that choosing life would not be an "emotional decision," Choosing death would be "difficult," but she could "detach" herself.

All of these circumstances support the conclusion that the prosecution excused these jurors for nondiscriminatory reasons and not due to group bias. These reasons, apparent from the record, are included in the actual reasons the prosecutors stated. This is no coincidence. The mere fact the prosecutors stated the reasons is not relevant to support a finding of no prima facie case. But the reasons apparent from the record and the reasons the prosecutor stated will generally, if not always, coincide.

Defendant notes that the prosecution challenged for cause another of the Hispanic prospective jurors, E.S., who eventually became an actual juror, on the basis that the juror had difficulty understanding the proceedings. The court denied the challenge. A prosecutor (and indeed any party) is entitled to challenge prospective jurors for cause. (*People v. Kelly* (2007) 42 Cal.4th 763, 780 [68 Cal.Rptr.3d 531, 171 P.3d 548].) Although a specious challenge for cause might in some circumstances support an inference of bias in a prosecutor's peremptory challenges, nothing in this record suggests the challenge was specious. The record indicates the trial court was concerned that E.S. might have trouble with English, was probably not well educated, and offered a somewhat inappropriate response suggesting he would have a problem with the age of defendants. Moreover, the prosecutor did not challenge this juror peremptorily.

The totality of the circumstances as they existed at the time of the court's first ruling did not suggest an inference of discriminatory purpose. The court properly found no prima facie case.

### c. Second Finding of No Prima Facie Case

After the court denied the first *Batson/Wheeler* motion, jury selection continued. The prosecution accepted the jury multiple times with three Hispanic prospective jurors on the panel while defendants continued exercising peremptory challenges.

During this time, Prospective Juror R.F. was called. He was the sixth and final Hispanic to be called other than those excused for cause or hardship. R.F. provided no response when asked his racial or ethnic background on the questionnaire, and the record does not otherwise indicate his race or ethnicity; he qualifies as Hispanic because he has a Spanish surname. Outside the presence of the jury, defendant's attorney challenged R.F. for cause for reasons not clear from the record. The court denied the challenge, stating, "I hope somebody excuses him, but I don't believe it rises to cause." When back in front of the jury, the prosecution exercised a peremptory challenge against R.F.

Later, defendant challenged one of the three remaining Hispanic jurors. After this, the prosecution accepted the jury two more times with the two remaining Hispanic prospective jurors on it. Then, after defendants exercised additional peremptory challenges, the prosecution challenged Hispanic Prospective Juror T.M. On her questionnaire, she identified herself as "Hispanic/white."

At this point, defendant made his second *Batson/Wheeler* objection, pointing out that the prosecution had challenged four of the six prospective Hispanic jurors subject to peremptory challenge. The court again found no prima facie case but invited the prosecution to "make a record with respect to [T.M.]." The prosecutor stated his reasons for that challenge: "She had some equivocation about the death penalty in her jury questionnaire. She indicated that: Police are fair most of the time. Sometimes I get the impression they prejudice people on how they look. She had mixed feelings about the death penalty. On page 20: Could you see yourself rejecting life and choosing the death penalty instead? She wrote no. She does work for the Department of Children Services [*sic*]. I think she would tend to be more sympathetic to the problems of the defendants in the penalty phase. She seemed more in tune with the defense attorneys than she was when the prosecution voir dired her. She had some problems with immunized witnesses on her questionnaire." The court did not evaluate those reasons but instead reiterated that it found no prima facie case.

The totality of the circumstances that existed at the time of this second objection also did not support an inference of a discriminatory purpose.

Defendant stresses that at this point, the prosecution had exercised four of its 10 peremptory challenges to challenge four out of six (i.e., two-thirds) of the prospective Hispanic jurors, which meant that, after defendant challenged another of the Hispanic prospective jurors, only one Hispanic individual was actually on the jury. It appears that, as of this time, 19 percent of the jurors subject to challenge (six of 32) were Hispanic. Considered alone, these circumstances might suggest a discriminatory purpose, but under the totality of circumstances, they do not. The prosecution challenged R.F. immediately after defendant himself had challenged R.F. for cause, and the court, while denying the cause challenge, had stated the wish that someone would excuse him. This circumstance strongly suggests a nondiscriminatory purpose for the challenge.

Additionally, before the prosecution finally challenged T.M. (as well as R.F.) it had accepted the jury several times with three and then, after defendant challenged one, two Hispanic jurors on it. This circumstance, although not dispositive, "strongly suggests that race was not a motive behind the challenge." (*People v. Kelly, supra,* 42 Cal.4th at p. 780; see *People v. Cunningham* (2015) 61 Cal.4th 609, 664 [189 Cal.Rptr.3d 737, 352 P.3d 318]; *People v. Clark* (2011) 52 Cal.4th 856, 906 [131 Cal.Rptr.3d 225, 261 P.3d 243].)

Additionally, the record clearly establishes nondiscriminatory reasons for challenging T.M. On the questionnaire, she answered "Yes" when asked whether she had "moral, ethical or religious beliefs that would make it difficult for you to vote for" the death penalty, explaining that "it would be hard, but it depends on the overall crime." After stating that she could return a verdict of life imprisonment, she answered "No" to the question: "Given the fact that you have two options available to you, can you see yourself, in the appropriate case, rejecting life imprisonment without the possibility of parole and choosing the death penalty instead." During voir dire, she said she could vote for the death penalty, but her questionnaire answers provided a strong reason for a prosecutor to excuse her out of concern about her views and not for a discriminatory purpose.

Defendant notes that the court did not invite the prosecution to state its reasons for excusing R.F. But because defendant himself had just challenged that juror for cause, and the court had expressed the wish that someone would excuse him, such an explanation was hardly necessary.

Defendant asks us to engage in comparative juror analysis, but such analysis is inappropriate in a first stage case such as this, where we do not evaluate the prosecution's stated reasons for the challenges. (*People v. Taylor, supra,* 48 Cal.4th at pp. 616–617.) Moreover, even if we were to engage in

comparative juror analysis in this situation, it would not aid defendant for the reasons stated in Justice Liu's concurring opinion.

In short, the totality of the relevant facts as of the time of the objections does not give rise to an inference of a discriminatory purpose. The trial court properly denied the *Batson/Wheeler* objections.

### B. Guilt Phase Issues

#### 1. Admission of Two Witnesses' Preliminary Hearing Testimony

The prosecution could not locate three witnesses at the time of trial and sought to have their preliminary hearing testimony admitted. The court denied the request as to one witness, finding the prosecution had not shown due diligence in locating him. It admitted the preliminary hearing testimony of the other two witnesses—Eduardo Rivera and Rosa S. Defendant contends the court erred as to these two witnesses.

##### a. Applicable Legal Principles

■ A criminal defendant has a state and federal constitutional right to confront witnesses, but the right is not absolute. If a witness is unavailable at trial and has given testimony at a previous court proceeding against the same defendant at which the defendant had the opportunity to cross-examine the witness, the previous testimony may be admitted at trial. In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a "good-faith effort" (*Barber v. Page* (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 88 S.Ct. 1318]) or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial. (*People v. Cromer* (2001) 24 Cal.4th 889, 892 [103 Cal.Rptr.2d 23, 15 P.3d 243] (*Cromer*); see *People v. Valencia* (2008) 43 Cal.4th 268, 291–292 [74 Cal.Rptr.3d 605, 180 P.3d 351] ["California law and federal constitutional requirements are the same in this regard."].)

"[T]he term 'due diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " (*Cromer, supra,* 24 Cal.4th at p. 904.) Relevant considerations include the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored. (*Ibid.*) The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially. (*People v. Bunyard* (2009) 45 Cal.4th 836, 851 [89 Cal.Rptr.3d 264, 200 P.3d 879] (*Bunyard*); *Cromer, supra,* 24 Cal.4th at pp. 900–901.)

b. *Eduardo Rivera*

Defendant agreed that the due diligence question regarding Eduardo Rivera could be based on the district attorney's offer of proof, which included the following. After the crime, Rivera, a Mexican national, told others that "he was distraught and was having a lot of mental and psychiatric problems as a result of witnessing the killing." Several months before trial, he told various people that "he was returning to Mexico to buy a plot of land and was not planning to return." Around April 1994 (i.e., six months before the Oct. 13, 1994 hearing), after a fourth suspect was arrested in these crimes, the district attorney's office attempted unsuccessfully to locate Rivera. Two investigators "found the same information, that everyone told him he had left, he was no longer at his former address or former employment or former phone numbers."

Since April 1994, Will Abram, an investigator with the district attorney's office, had tried to locate Rivera. With the assistance of the Immigration and Naturalization Service, he determined that Rivera was, in fact, a Mexican national. Abram located Rivera's brother on September 23, 1994, living in the San Francisco area, who confirmed that Rivera had "returned to Mexico with no definite plans to return at this time." The brother could not give a telephone number for Rivera because he had no telephone. The location was "a small village outside of Guadalajara which, to our information, has one phone. His brother has made several attempts to leave messages at that phone to have his brother return his call, to no avail."

Abram also told the court that the last conversation with the brother "was on October 4, last week, and the brother reiterated at that time that he made several attempts to call and left messages for his brother to return the call and he has not heard from Mr. Rivera yet."

Based on these facts, the court found that the prosecution had exercised due diligence to obtain Rivera's presence at trial and admitted his preliminary hearing testimony.

At trial, defendant argued that the prosecution should have sent an investigator to Mexico to try to find Rivera and convince him to come to California voluntarily to testify. On appeal, relying on cases that postdate the trial, he also argues that the prosecution should have made use of a treaty between Mexico and the United States that took effect in 1991 and that, as one of the cases defendant cites describes it, "allows the prosecution to request the assistance of Mexican authorities to invite a person in Mexico to come to California and testify and to inform the person concerning the extent to which expenses will be paid." (*People v. Sandoval* (2001) 87 Cal.App.4th

1425, 1439 [105 Cal.Rptr.2d 504], fn. omitted (*Sandoval*); see *People v. Herrera* (2010) 49 Cal.4th 613, 626–627 & fn. 7 [110 Cal.Rptr.3d 729, 232 P.3d 710].)

The Attorney General argues that defendant has forfeited the claim that the prosecution should have made use of the treaty because he did not make that argument at trial. We disagree. Defendant objected to the admission of the preliminary hearing testimony and argued the prosecution had not shown due diligence in procuring the witness's presence. Given that the prosecution has the burden of showing due diligence, this objection was sufficient to preserve the contention. The argument at trial need not be identical to the appellate argument in all respects. However, the circumstance that no one suggested the prosecution make use of the then very recent treaty is relevant to the question of whether the prosecution had made a good faith effort, i.e., exercised due diligence, to obtain the witness. The prosecution must do what is reasonable under the circumstances, not necessarily everything that can be suggested in hindsight.

Under the circumstances here, we conclude the prosecution exercised due diligence. It determined that Rivera had left California and returned to his native Mexico, and was apparently living in a village with only one communal telephone. It located Rivera's brother, who tried, unsuccessfully, several times to contact Rivera. It is speculative to believe that additional efforts would have resulted in finding him and convincing him to return voluntarily to the United States to testify.

Nor was Rivera's testimony particularly important. (*Cromer, supra*, 24 Cal.4th at p. 904.) Rivera, although important in the sense that he positively identified defendant as the perpetrator of very serious crimes, was but one of many witnesses, whose testimony was consistent and who overwhelmingly established defendant's guilt of the crimes about which Rivera testified. In a case like this, with dozens of witnesses, there is a limit to what one can expect the prosecution to do to procure the attendance of a noncritical witness.

Defendant relies on *Sandoval, supra*, 87 Cal.App.4th 1425. But, unlike that case, Rivera was not a "crucial witness." (*Id.* at p. 1428.) Nor, also unlike *Sandoval*, had the prosecution established contact with Rivera.

We conclude the trial court correctly found the prosecution exercised due diligence to try to locate Rivera and properly admitted his preliminary hearing testimony.

c. *Rosa S.*

Rosa S. was 13 years old at the time of the events about which she testified (May 1992), 14 years old when she testified at the preliminary hearing (Mar. 1993), and 16 years old at the time of the due diligence hearing on October 13, 1994. It appears she gave birth to a baby in January 1994, several months before the due diligence hearing.

Rosa had testified at the preliminary hearing under a grant of use immunity. Before she testified, the prosecution informed the court that it was having difficulty locating her. Two days later, it stated that it had finally located her the previous day when she was arrested in an unrelated matter. It requested that she be held to testify as a material witness under Penal Code section 1332. (See *Bunyard, supra,* 45 Cal.4th at p. 847.) The court ordered $20,000 bail be set to ensure her testimony. Two days later, after she had testified on direct examination and cross-examination had begun, the prosecution asked the court to set no bail at all because the witness had "indicated she has wanted to stay on the street, not any intention of returning home or resurfacing in this case." The court maintained the $20,000 bail, and Rosa completed her testimony.

At trial, the prosecution informed the court it could not locate Rosa, and a due diligence hearing was held, based on representations from the two prosecutors and the testimony of investigator Will Abram.

The prosecutor stated that Rosa "has always been very cooperative in terms of testifying in this matter and providing information." On May 4, 1994, after a fourth suspect in these robberies had been arrested, one of the prosecutors and Deputy Perales, the investigator who later testified at trial, visited her in Pomona. That prosecutor described her at that time as "very friendly, very cooperative. She gave us the name of her social worker, her home number, her home address." The prosecutor told Rosa that she would be needed to testify at the preliminary hearing against the fourth defendant and in this trial in September. "She indicated she did not want to do it, but she would, that she understood that she needed to tell the truth and to be available." At that time, the prosecution served her with a subpoena to attend a live lineup on May 16, 1994, involving the fourth defendant and with a subpoena to appear on September 7, 1994, in this matter. She did appear at the live lineup as scheduled, at which time she was again served with a subpoena to appear on September 7.

According to one of the prosecutors, during this time Rosa "continued to exhibit cooperativeness with the district attorney's office in this matter, such that we didn't expect to have difficulties finding her." He explained, "We go

back to her prior history. She was a runaway and that was the only thing that we understood was the problem in contacting her was that she kept running away from her parents. Once she was no longer with her parents, we did not expect to have any of the problems that have occurred."

That May, Rosa also told the prosecutor that "she had not yet turned herself in on the outstanding warrant from Pomona." When told that she needed to turn herself in, "[s]he agreed that she would clear up the matter."

The prosecutor and Deputy Perales visited Rosa again in July 1994. She had moved to Montclair in the meantime. They told her that the preliminary hearing regarding the fourth defendant and the trial in this case was coming up. She again said she had not yet turned herself in. "Detective Perales again told her that she had to turn herself in or she would be picked up on the warrants immediately." Rosa agreed to do so.

In August 1994, the prosecutors learned that Rosa had in fact turned herself in and the Pomona matter was disposed of, with a final hearing scheduled for the following October 14 (i.e., the day after the due diligence hearing). During August, she had been in custody in that matter for several days. Then, according to one of the prosecutors, Rosa "was released to her parents pending a pickup by the community detention program." When the deputy district attorney handling Rosa's Pomona matter asked the prosecution in this case what it wanted done with her in that matter, the prosecutor, "knowing that she had been cooperative with us and knowing that she now had an address that was different from the address that she had been running away from, that of her parents, we indicated that we don't have a problem with her release as long as there is electronic surveillance with her."

The prosecutor explained further, "Between the time she testified at the preliminary hearing and the time she was served with the subpoena, she had a baby. We believed this to lend her some stability. She also is collecting checks from, I believe, D.P.S.S. [Department of Public Social Services], and we agreed to the release on the community detention program, but there were no promises whatsoever made to [Rosa] in exchange for cooperation or anything like that. It turns out, as I see from the minute order from the juvenile court which sustained her petition, that she was released to her parents. This is the place that she had been running away from. She was released to them pending the installation of the electronic surveillance device. The very night she was released to her parents, she left. We have not been able to find her since." The Pomona court issued a warrant for her arrest on August 19, 1994.

Investigator Abram testified about his efforts to locate Rosa after her release from custody in August 1994. (All dates mentioned in his testimony

are to the year 1994.) He began trying to find her on August 31, when he went to her last known address and spoke to the manager, who said he did not recognize Rosa's photograph. The next day, he contacted the Department of Public Social Services, and was told the person assigned to Rosa's case was on vacation until the following Tuesday. He also called the clerk of the Pomona court that had handled her case, who gave him the telephone number of the attorney who had represented her. He called that number, but it was disconnected and there was no new number. He called the State Bar and was given a number for the attorney, but it was also disconnected. He also called the community detention program that Rosa was supposed to be on and spoke with a person who said she would research the matter and call him back.

On September 7, Abram spoke with the assigned case worker with the Department of Public Social Services, who gave him a new address for Rosa in Pomona. He went to the apartment at that address and spoke with Naomi Rojas, who said that Rosa had come to the apartment on September 1 to pick up her welfare check, but that she had not lived there for two months. Rojas said she was the sister of the man who was reportedly the father of Rosa's baby. However, Rojas said, "shortly after the baby was born, [Rojas] and her mother . . . found out this was actually not their brother's baby. Difficulties arose. That is why [Rosa] was no longer living with them. She said she had no idea where [Rosa] was living." Rojas gave Abram the baby's name and date of birth. He called the caseworker at the Department of Public Social Services, and she agreed to hold Rosa's check and call him if Rosa called in with a new address.

Abram also contacted the deputy district attorney assigned to Rosa's Pomona case, who checked the file and verified that "Rosa had inadvertently not been placed on the electronic home surveillance." He spoke with the probation officer assigned to Rosa's case, who told him that "through some paper mishap Rosa was placed on an informal probation status and . . . that is why she was not placed on this home detention program." On September 12, he obtained a copy of the juvenile court's minute order and August 19 arrest warrant.

On September 15, Abram received a call from the Department of Public Social Services caseworker, who said Rosa had called that morning and given her a new address in Pomona. He asked her to continue to hold Rosa's welfare check until he visited that address. On September 20, he spoke with Rosa's father, who told him he picked his daughter up on August 19, and she ran away the next day. He filled out a missing person's report with the sheriff, and did not know where Rosa was. Abram also went to Rosa's new address and spoke with Lucy Espinoza, who was living at the apartment. She told him Rosa had been living at the next-door apartment with Naomi Rojas and

her mother. She had received a telephone message from Rosa on September 17 that just left her name. Abram told her he was looking for Rosa, not because she was in trouble, but because he was trying to help her and needed her to testify in court. Espinoza "expressed concern for Rosa because she felt Rosa was very young and easily misled and she would assist me in any way possible."

On September 29, Abram again spoke with the caseworker and asked her to continue to hold the welfare check because Rosa was not living at the new address. She told him she could not stop the check from being mailed. On October 1, he returned to the last known address and spoke again with Espinoza. He took the welfare check from her and told her to have Rosa call him when she came to pick it up. He gave her a 24-hour number at which he could be reached. On October 2, he told one of the prosecutors that he had the check and expected Rosa to call him. On October 12, he again called Espinoza, who said she had not seen or heard from Rosa. He also verified that he would be notified if and when Rosa was brought in on the arrest warrant.

On cross-examination, defense counsel ascertained that Abram had not tried to contact Naomi Rojas's brother, the purported father of Rosa's child. Abram further testified that Rosa's father had told him that before he remarried, "he and his daughter got along fine. Once he remarried, his daughter did not get along with his new wife and it created these types of problems. She has been a runaway apparently a year and a half or close to two years, and we are talking about a girl that is only 16 years old now."

At the end of the hearing, the court ruled: "I think there is due diligence. . . . [I]n terms of what the People did and the way it ended up, resulting in the contact made in August, the fact she showed up on the warrant to attend the lineup, her cooperativeness other than the apparent problems she had with her father . . . . I don't know what else they could have done other than your saying she should have been kept in custody from August. In light of the way it was presented, I don't think the D.A.'s decision to let her go was unreasonable."

Defendant makes two arguments. First, he argues that on August 19, 1994, the prosecution should have asked the juvenile court to keep Rosa in custody until her appearance at trial. Second, he argues that Abram's efforts to locate her were insufficient. We disagree on both points.

■ "[W]hen the trial court errs in releasing a material witness from custody, which results in the witness becoming unavailable for testimony, and the prosecution supports that release, the prosecution may be held to have not

exercised reasonable diligence." (*Bunyard, supra,* 45 Cal.4th at p. 849.) "The decision to detain in custody a material witness involves weighing important competing rights. . . . [¶] . . . The unjustified deprivation of a material witness's liberty is a violation of the due process clauses of the federal and state Constitutions." (*Id.* at pp. 849–850.) Thus, the defendant's right to confront witnesses must be balanced "against the substantial due process right of the witness, who has not been charged with a crime, to not be unreasonably incarcerated." (*Id.* at p. 851.) "To have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly." (*People v. Cogswell* (2010) 48 Cal.4th 467, 477 [106 Cal.Rptr.3d 850, 227 P.3d 409].)

Under the circumstances, we agree with the trial court that the prosecution was not required to try to keep Rosa in custody until she testified. The trial court credited the prosecution's statements that Rosa had been cooperative, and that it did not believe it would be difficult to obtain her trial testimony. Defendant argues this asserted belief "was at best unreasonable and more likely disingenuous." But the evidence supports the court's finding regarding what the prosecution actually believed, and we will defer to it. Whether, as the trial court also found, the belief was reasonable under the circumstances is something we will decide independently.

Defendant notes, as he did in the trial court, the prosecution's very different attitude during the preliminary hearing, when it informed the court it was having difficulty locating Rosa and took steps to ensure her testimony. But the two situations are not necessarily inconsistent. Before she testified at the preliminary hearing, the prosecutors presumably had little experience with her and, given the difficulties in locating her and her statements to them, they were reasonably concerned that she might not cooperate. But she did testify. In the interim between the preliminary hearing and the trial, they had numerous contacts with Rosa. The prosecutors said she was consistently cooperative, and the record provides no reason for this court to conclude otherwise. She did in fact honor the subpoena to appear at a live lineup regarding the new fourth suspect. Defendant argues that her appearance at that time is irrelevant. On the contrary, her cooperation was highly relevant to whether the prosecution reasonably believed she would appear at trial.

It is true that the record reflects Rosa's unstable lifestyle. She was a runaway and lived at various locations. But, as the prosecution believed, the fact she had recently given birth might have lent her more stability. Moreover, the risk that, despite her apparent cooperation, she might not appear to testify had to be balanced against her liberty interest. Although there was an unrelated juvenile matter against her, she was charged with no crime in this

case, and no evidence exists that she committed any. The necessary period of incarceration to ensure her testimony would have been lengthy. Defendant notes that she had been subpoenaed for the date trial was scheduled to begin, September 7, 1994, which was less than three weeks after her release from juvenile court custody. But the evidence portion of trial would not begin for weeks after that. The due diligence hearing was held on October 13. Presumably, if Rosa had been in custody, she could have testified earlier than that. But the evidence portion of trial did not begin until September 26, 1994. Even if she were to testify that first day, she would have been in custody for some 38 days for the sole purpose of ensuring her testimony. Especially given the fact that Rosa had a several-month-old baby at the time, we find reasonable the prosecution's decision not to adopt this "drastic" measure that "should be used sparingly." (*People v. Cogswell, supra,* 48 Cal.4th at p. 477.)

■ We also agree with the trial court that the prosecution exercised due diligence in trying to locate Rosa after her August 19, 1994 release in the juvenile proceeding. "[D]iligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period." (*Bunyard, supra,* 45 Cal.4th at p. 856.) Defendant argues the prosecution's efforts were too little and too late. But beginning the search on August 31, only 12 days after her release, was reasonable. Investigator Abram made reasonable efforts to try to locate her, including pursuing several leads and trying to withhold her welfare check to motivate her to contact him. Defendant suggests other measures Abram might have taken, such as trying to contact the reported father of Rosa's baby, who might have been in prison at the time. Additional measures can always be suggested. "But these suggestions do 'not change our conclusion that the prosecution exercised reasonable diligence. "That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness." ' " (*People v. Valencia, supra,* 43 Cal.4th at p. 293.)

Accordingly, we conclude the trial court did not err in admitting Rosa's preliminary hearing testimony.

### 2. Other Contentions Regarding Rosa S.'s Testimony

Defendant makes two additional arguments regarding Rosa S.'s preliminary hearing testimony.

#### a. Admission of Hearsay Statement

After the court ruled that Rosa S.'s preliminary hearing testimony was generally admissible at trial, the court and parties discussed that testimony in

detail to determine which specific portions were admissible. The court excluded as hearsay Rosa's testimony that Navarro had told her that defendant "had shot a cop," and that Navarro and defendant each purchased a car. It also ruled that statements by Navarro indicating that he had committed robberies was admissible only against Navarro, and it so admonished the jury.

During the actual reading of the preliminary hearing testimony, the prosecutor inadvertently included Rosa's testimony that Navarro had told her that defendant "had shot the cop," for which he apologized outside the jury's presence. The court granted defendant's motion to strike that testimony and admonished the jury to disregard it.

In addition, a taped statement Rosa made to the police the day Navarro was arrested was played over defendant's objection at both the preliminary hearing and again at trial as either prior inconsistent or prior consistent statements. (As regarding defendant, that statement was consistent with her preliminary hearing testimony.) It appears this statement was not redacted to exclude Navarro's hearsay statements. Accordingly, the jury heard the following. Rosa said that defendant had told her that he had shot the police officer. Additionally, she said, "And [Navarro] told me, all of them know that." Later, she said that defendant and Navarro had each bought a car with money "from another store robbery" about three or four months previously in which they each obtained about $14,000.

Defendant contends these statements from the taped statement were hearsay and not admissible against him. He argues that admitting these statements violated his constitutional right to confront witnesses, specifically his right to confront Navarro. (See *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) The record is not entirely clear, but it appears the source of the information about "another store robbery" was Navarro, not defendant, and we will assume that is the case. It is also not clear whether the court intended to admit these hearsay statements from the taped statement after it had excluded comparable statements from Rosa's preliminary hearing testimony, or whether the statements were simply overlooked in the complex and lengthy discussions over which portions of the preliminary hearing testimony to admit and which to exclude.

What is clear, however, is that any error in admitting these portions of the taped statement was harmless beyond a reasonable doubt. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 [140 Cal.Rptr.3d 139, 274 P.3d 1132].) Because Rosa specifically testified that defendant told her he shot the police officer, her statement that Navarro had said the same thing could not have been prejudicial. Her statement that defendant had committed a previous

robbery was also nonprejudicial. The jury heard overwhelming evidence that defendant had committed not one but six previous robberies. Indeed, defendant conceded his identity regarding some of the robberies. For example, in addition to the many eyewitness identifications, he left behind one of his shoes when fleeing the Ofelia's Restaurant robbery, and jewelry from some of the robberies was found concealed on his person when he was arrested. Given this evidence, Rosa's mention of a previous store robbery was innocuous.

### b. *Limitation on Cross-examination*

At the preliminary hearing, defendant cross-examined Rosa S. at length. When she was found in the car with Navarro on May 31, 1992, she was arrested and charged in an unrelated matter in Pomona. Much of the cross-examination concerned this other matter and whether she was promised or expected any benefit in that matter for her testimony in this case, generally eliciting denials of any such promise or expectation. She said that, other than that she would have to testify, she did not discuss this case with those involved in the Pomona case, including her Pomona attorney. Counsel also elicited testimony that before her preliminary hearing testimony, she had discussed this case with the two prosecutors and Deputy Perales, the investigator in this case. Additionally, defense counsel elicited from her that she had refused to speak with him when she had the opportunity to do so, and that she had initially lied to the police and court about her name and age.

When Rosa's preliminary hearing testimony was read to the jury, the jury was also informed that she had been given immunity for her testimony regarding any nonviolent crimes; that when she invoked her Fifth Amendment right to remain silent, the court ordered her to testify under the grant of immunity; that she was in custody when she testified; and that, after her testimony, she had been released from her custody status regarding this case.

At the preliminary hearing, the court sustained prosecutorial objections to questions regarding who else she had talked to about the Pomona case and who else other than her attorney she had talked to in the "Van Nuys courtroom," apparently referring to the courtroom involved in this case. Defendant contends this limitation violated his constitutional right to confront and cross-examine Rosa.

■ A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury with facts from which it could appropriately draw inferences regarding the witness's reliability. But not every restriction on a defendant's cross-examination violates the Constitution. The trial court retains wide latitude to restrict repetitive, prejudicial,

confusing, or marginally relevant cross-examination. Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *People v. Capistrano* (2014) 59 Cal.4th 830, 866 [176 Cal.Rptr.3d 27, 331 P.3d 201]; *People v. Virgil* (2011) 51 Cal.4th 1210, 1251 [126 Cal.Rptr.3d 465, 253 P.3d 553].)

We see no constitutional violation in the slight restriction the preliminary hearing court imposed. Defense counsel was given wide latitude to cross-examine Rosa, including whether and to what extent she expected or hoped that her testimony would benefit her in the Pomona case. Counsel elicited that Rosa spoke with the investigators and prosecutors in this case, who were the ones who would be expected to offer her benefits for her testimony, if anyone did. She testified that she did not discuss this case with the people in Pomona (other than regarding that she would have to testify). Further testimony regarding exactly who she spoke with in Pomona would not significantly affect the credibility of this testimony.

Moreover, no significant reason existed for the jury to doubt Rosa's general credibility. Her testimony regarding defendant was consistent with her initial taped statement. The main thrust of that testimony was that she heard defendant say he shot the police officer, something a 13-year-old girl would be expected to understand and remember. Although she originally lied about her age and name, was a runaway, and refused to discuss the case with defendant's attorney, none of these circumstances would likely provide a motive to lie about defendant. Perhaps most importantly, her testimony was entirely consistent with the remaining evidence. The evidence established that one of the gunmen in the George's Market robbery shot and killed Officer Hoglund, and that defendant was one of those gunmen (among other items of evidence, his image was captured on the videotape). So the only remaining question regarding who shot Officer Hoglund was whether defendant was that gunman. Defendant looked nothing like the other gunmen and wore a distinctive striped shirt, unlike the shirts the other gunmen wore. Accordingly, the jury could readily conclude that Medina was not mistaken in his testimony that defendant was the gunman who shot Officer Hoglund and pointed the gun at him.

The ballistics evidence also strongly corroborated Rosa's testimony. One gun was fired at all three robberies that involved gunfire: those at the Woodley Market, Ofelia's Restaurant, and George's Market. Many witnesses identified defendant as the shooter at Ofelia's Restaurant (where the shooter left behind a shoe that the parties stipulated belonged to defendant) and at

Woodley Market, thus strongly showing that defendant was the one who fired that weapon on all three occasions.

In light of all this, the prohibited cross-examination would not have produced a significantly different impression of Rosa's credibility and, accordingly, it did not violate defendant's right to confront her.

### 3. *Admission of Evidence of Uncharged Crime*

Over defense objection, and after a hearing, the court admitted evidence of the uncharged incident at Rod's Coffee Shop, during which defendant was stopped while driving a car containing a stun gun. Defendant contends the court erred in violation of various constitutional rights. We conclude the court acted within its discretion.

When the court first considered the matter, it ruled that if defendant conceded the question of identity regarding the Casa Gamino robbery (the one during which the stun gun was used), it would disallow evidence of the incident at Rod's Coffee Shop because "the prejudice outweighs the probative value where [identification] is no longer in issue at the Casa Gamino robbery." But it invited the prosecution to revisit the question if, in fact, defendant did dispute identity regarding that robbery.

Later, when it became apparent that defendant was in fact challenging his identity as the one who used the stun gun during the Casa Gamino robbery, the court admitted evidence of the incident at Rod's Coffee Shop. It explained that the stun gun "is so unique and so unusual. In fact, in all my years in the justice system, whichever side of the bench I was on, I have never seen an electrical device being used. . . . I don't think it matters that it wasn't the same one, but it is so unique that I think under all the case law that permits [evidence under Evidence Code section 1101] where it is material, there's no other rule that would not permit it, and under [Evidence Code section] 352 I think the probative value far outweighs any prejudice or confusion that arises from it." It gave a limiting instruction regarding how the jury could consider the evidence.

■ Evidence of other crimes is generally not admissible merely to show a criminal disposition, but it may be admitted if relevant to show a material fact such as identity. (Evid. Code, § 1101; cf. Evid. Code, § 1108 [special rule concerning evidence of sex offenses].) The admissibility of such evidence depends on (1) the materiality of the facts to be proved; (2) the tendency of the evidence to prove those facts; and (3) the existence of a rule or policy, such as that of Evidence Code section 352, requiring exclusion of the evidence. (*People v. Kelly, supra*, 42 Cal.4th at p. 783.) "Because substantial

prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. [Citation.] This determination lies within the discretion of the trial court." (*Ibid.*) Here, the court admitted evidence of the incident at Rod's Coffee Shop primarily on the question of defendant's identity as the one who used the stun gun during the Casa Gamino robbery. "For identity to be established, the offenses must share common features that are so distinctive as to support an inference that the same person committed them." (*People v. Scott* (2011) 52 Cal.4th 452, 472 [129 Cal.Rptr.3d 91, 257 P.3d 703].)

As the trial court found, possessing a stun gun was unusual, especially in 1990 and 1992. Because the police seized the first stun gun in 1990, obviously a different one was used in the 1992 Casa Gamino robbery. But the evidence showed that both were functioning and, when activated, emitted similar blue sparks. The narrow question on which the evidence was most probative was which of the Casa Gamino robbers used the stun gun. The facts that defendant participated in activity that a jury could reasonably conclude was a prelude to a robbery similar to the ones he later committed, and that a stun gun was in his car, support a reasonable inference that defendant was that person. No evidence connected any of the other robbers to a stun gun. Whether defendant wielded the stun gun was certainly material at trial. Moreover, the evidence was not particularly prejudicial. Because no robbery actually occurred at Rod's Coffee Shop, the uncharged incident was not nearly as inflammatory as the charged crimes. The court therefore acted within its discretion in finding the probative value outweighed any undue prejudice.

Defendant also argues that, because the gun was under the passenger seat and he was the driver, the evidence was insufficient to support a finding by a preponderance of the evidence that he had possessed the stun gun. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 382 [63 Cal.Rptr.2d 1, 935 P.2d 708] [preponderance of the evidence is the proper standard for uncharged crimes].) But the jury could have readily inferred that defendant, the driver, who appeared to be acting in tandem with the others in the car, knew of the gun and had control over it. We see no error.

### 4. *Sufficiency of the Evidence as to One of the Robberies*

Defendant contends the evidence was insufficient to support his conviction for robbing Arturo Flores at the Mercado Buenos Aires market. We agree and reverse defendant's conviction and sentence for that robbery.

To decide whether the evidence is sufficient to support a jury verdict, "a reviewing court reviews the entire record in the light most favorable to the

judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." (*People v. Rountree* (2013) 56 Cal.4th 823, 852–853 [157 Cal.Rptr.3d 1, 301 P.3d 150].)

Flores testified at the preliminary hearing that one of the gunmen took his wallet. However, he could not be located to testify at trial and, after a hearing, the court ruled that the prosecution had not exercised due diligence to obtain his presence at trial. Accordingly, the court refused to admit his preliminary hearing testimony. No witness who actually testified at trial observed Flores's property being taken. Witnesses testified that the four persons Flores was with in the bathroom were robbed: Manuel Rodriguez, Paul Rodriguez, Clelia Rodriguez, and Dario de Luro. Additionally, Manuel Rodriguez testified that he "think[s]" others, which probably included Flores, had been robbed earlier. This evidence would support a conclusion that Flores was probably also a robbery victim. But absent any testimony that someone observed property being taken from Flores or other evidence that he was missing property, we do not believe the evidence supports a conclusion beyond a reasonable doubt that he was a robbery victim.

Accordingly, we reverse that robbery conviction, count 21 in the information. In addition to entering a judgment of death on the murder counts, the court imposed, and then stayed, a total determinate prison sentence of 54 years six months. Of this, one year (one-third the midterm of three years) was imposed for the Flores robbery. In light of the reversal of that conviction, we reduce the determinate prison sentence to 53 years six months.

### 5. *Contentions Regarding the Attempted Murder Charge*

The jury found defendant guilty of attempting to murder Luis Enrique Medina shortly after he shot Officer Hoglund to death. Defendant challenges the conviction in two regards. First, he argues that parts of Medina's testimony should have been stricken as speculative. Second, he argues that the evidence was insufficient to support the conviction.

The attempted murder charge was based largely, although not entirely, on Medina's testimony. On direct examination, Medina, a former police officer familiar with handguns, testified that when defendant aimed his gun at him, he could tell the gun was empty because the slide was open. When asked whether that was the position the gun was in when defendant pointed it at him, he responded, "Yes, but I believe he wanted to put another clip inside." The court sustained defendant's motion to strike that statement on the ground it was speculative. After Medina further testified that he had seen defendant's finger on the trigger, the testimony moved to other areas.

The subject was revisited on redirect examination. The prosecutor asked Medina whether he saw defendant pull the trigger. He responded, "I was unable to notice whether he pressed the trigger, but I believe that he tried to do that." The court sustained defendant's motion to strike the statement on the ground it was speculative. The prosecutor then asked whether Medina saw any movement or what he thought were attempts to pull the trigger. Medina responded, "I think he was trying to put another clip there." Again, the court sustained defendant's motion to strike the statement on the ground it was speculative. The prosecutor then asked about the witness's preliminary hearing testimony, in which he agreed he had testified that defendant "kept pulling, but the gun didn't have any more bullets in it." Medina agreed that his memory was better at the time of the preliminary hearing.

On recross-examination, defense counsel asked the witness about the apparent change in his testimony regarding whether he saw defendant's finger moving. He asked, "Now, yesterday, you didn't tell us that his finger was moving and today you are. Why is there a difference?" Medina responded, "There is no change in my testimony. What I said is that he was aiming the gun at me and I was just looking at the gun. I can't really know all the things he did with his hands. It's impossible that I be able to relate all the details. I mean, you think that one can do that. I was just thinking about what was going to happen to me." He reiterated that defendant "was trying to shoot, but there were no bullets in the gun. So he tried to change the clip. Well, it seems logical if somebody is pressing the trigger and there is no bullets inside the gun, then one tries to load the gun again." The court overruled defendant's motion to strike this testimony as speculative.

Defense counsel asked Medina whether he saw defendant put a new clip in the gun. He responded, "No, I didn't say that he changed it. I said that he wanted to do so. But then he took off running because they were calling him, telling him to get out of that place." When defense counsel suggested Medina was trying to read defendant's mind, he responded that defendant "made a gesture as to remove the clip that was there." Pursuing the matter, defense counsel asked whether the witness had seen defendant taking out the clip. He responded, "No. But he was trying to do so." He also said, "If his friends hadn't been calling him, I believe he would have done it." Defense counsel renewed his motion to strike the testimony, which the court denied.

Later, outside the jury's presence, the trial court explained its denial of defendant's motion to strike the testimony as speculative: "The reason I denied the objection is because I think we have a language problem, number one. So I don't think the examination is as precise as we could ever get it with English. [Medina testified through a Spanish language interpreter.] And, secondly, he did . . . say specifically he tried to change the clip, and . . . he

referred to a gesture. . . . I think it goes beyond mere speculation." Because of this, the court believed it was "something for the jury to figure out, not to me." It summarized: "Today, he said he tried to change the clip. There was a gesture. That's beyond just a mere speculation . . . . But, anyway, I think it is enough for the jury to crank out [*sic*] and not me to take it away from them."

Defendant argues that the testimony about his wanting to change the clip and his gesture should have been stricken as speculative. (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1023 [inferences may not be based on speculation].) The court initially sustained defendant's objections on this ground, but it overruled later objections after it permitted both parties to ask probing questions that elicited answers clarifying that Medina's testimony was based on his observations, not speculation. Although he could not, or at least did not, articulate it further, he testified that defendant made a gesture that to Medina indicated he was about to replace the clip.

■ This part of Medina's testimony was essentially lay opinion testimony. " 'A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code, § 800, subd. (b)), "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." [Citation.]' (*People v. Hinton* (2006) 37 Cal.4th 839, 889 [38 Cal.Rptr.3d 149, 126 P.3d 981].) Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them (*ibid.*) or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. (*People v. Melton* (1988) 44 Cal.3d 713, 744 [244 Cal.Rptr. 867, 750 P.2d 741]; *People v. Manoogian* (1904) 141 Cal. 592, 595–597 [75 P. 177].) A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. (*People v. Chatman* (2006) 38 Cal.4th 344, 397 [42 Cal.Rptr.3d 621, 133 P.3d 534].) . . . A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130–131 [158 Cal.Rptr.3d 797, 303 P.3d 1]; see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1310–1311 [192 Cal.Rptr.3d 195, 355 P.3d 384].)

Exactly what occurred in the few seconds during which defendant pointed the gun at Medina was subtle and complex, and the court could reasonably conclude it would be impossible to convey Medina's concrete observations other than through the testimony it permitted. In sum, the court acted within its discretion in concluding that Medina's testimony was not speculative but based on his observations, and leaving it to the jury to evaluate it.

Defendant interprets the court's mention of what it believed to be a "language problem" as applying a "less stringent standard to testimony given through a Spanish interpreter" than given to other witnesses, and he argues that doing so violated his right to equal protection of the laws. We see no error in the court's comment regarding the difficulty of testifying through an interpreter. Ultimately, the same standards apply to all witnesses, and the court did not suggest otherwise.

 Defendant also argues the evidence was insufficient to support the jury's attempted murder verdict because it was insufficient to demonstrate his intent to kill Medina. "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts. (*People v. Smith* (2005) 37 Cal.4th 733, 741 [37 Cal.Rptr.3d 163, 124 P.3d 730].)

Here, the evidence was ample to support the jury's finding. Medina testified that defendant placed his finger on the trigger when he pointed the gun at him and then, when he realized the gun was empty, made a gesture to change the clip. Defendant claims Medina "embellished" his testimony. But it is for the jury, not a reviewing court, to determine credibility. (*People v. Smith, supra*, 37 Cal.4th at p. 739.) Both the prosecution and defendant questioned Medina closely on his exact observations. The jury was entitled to believe him. Moreover, Medina's testimony was not the only evidence supporting a finding of intent to kill. Only seconds before he pointed the gun at Medina, defendant had shot Officer Hoglund three times, killing him. Medina was only about eight feet from defendant and, so the jury could reasonably have found, was in his way when defendant pointed the gun at him, just as Officer Hoglund had been in defendant's way. All of this evidence supports defendant's conviction for attempting to murder Medina.

### 6. *Refusal to Investigate a Juror's Alleged Reaction to Testimony*

Among the portions of Rosa S.'s preliminary hearing testimony read to the jury was the following: Defendant and Navarro "were going to go pick up some drugs and sometimes the black guys and the cops would get in their way. That's why they took guns with them."

Shortly after this testimony, defendant's attorney asked to approach the bench. Outside the jury's presence, counsel stated that during the prosecution's opening statement referring to this testimony, Juror M.L., an African-American, "made a very adamant up and down motion with her head." He

said he was worried "that she had made up her mind right then, and that is all she needed to hear was there was some kind of violence against blacks. And her gesturing with her head appeared to be in response to that statement during the opening statement. Now that the same line was just read to the jury, [M.L.] did the exact same thing, a very adamant up and down motion with her head. I don't have any doubt in my mind she has already made up her mind what she is going to do with the penalty phase and guilt phase because of the perception there is violence against blacks." Counsel for codefendant Navarro said he made similar observations. The court stated it did not see it.

The court noted that there were "no blacks involved as witnesses, victims, or defendants in the case other than she is a black juror." Counsel asked the court to hold a hearing "about whether or not she has already made up her mind and decide if you want to throw her out." The court denied the request, noting that "we are dealing with pure speculation." It explained, "I don't think anything is established by an adamant head shake. I see jurors nodding or sitting up or dozing or looking off. If I had to stop and have a hearing every time I saw a reaction by a juror, we would never get through a trial." It added, "I don't think it would at all be appropriate to have a hearing."

Later, again outside the jury's presence, one of the prosecutors stated she was watching M.L. after counsel made his objection: "She was rocking, just like rocking back and forth. I did not see any nodding, just more of a nervous habit. She was rocking during the entire testimony." Counsel for Navarro stated that that was different from what they had observed. Counsel for defendant stated that a paralegal had observed the same thing during the opening statement. He added, "After we approached and had the discussion about her, she mostly stared at me, and I think she figured out that we were talking about her." The court observed, "She probably did . . . . We all looked over at her when we were standing at side . . . ." Counsel for defendant said he did not look at her.

Later still, after the parties concluded their closing arguments to the jury, the court stated the following outside the jury's presence: "I have been sensitive to [M.L.'s] reactions to any reference to blacks or cops getting in the way of the guns. And I noted the rest of that day where you had your concerns expressed she continued to rock in her chair. And every time she rocked, her head nodded. And I saw nodding throughout the rest of the afternoon. Yesterday, when [one of the prosecutors] twice in his argument mentioned that same statement, there was absolutely no reaction from her. And today there was absolutely no reaction from her. And she has continued to rock and nod. I am not saying there may not have been a reaction, but I'm not sure that we can assume her state of mind, and I want you to know that I

have been watching it, that every specific time that issue came up I watched her and have seen absolutely no reaction."

 Defendant argues the court's failure to investigate M.L.'s perceived reaction to the testimony violated various of his constitutional rights. We disagree. "[N]ot every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.] . . . [¶] As our cases make clear, a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225]; accord, *People v. Manibusan* (2013) 58 Cal.4th 40, 53 [165 Cal.Rptr.3d 1, 314 P.3d 1].)

We find no abuse of discretion. Unlike this court, the trial court was in a position to observe the juror's demeanor. It took defendant's allegations seriously and carefully observed the juror's later reactions. Based on these observations, it properly refused to question the juror. We have cautioned that the "very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations." (*People v. Cleveland, supra*, 25 Cal.4th at p. 476.) Similar concerns exist midtrial. The very act of questioning M.L. about her reactions to testimony would tend to suggest she had done something wrong, which could adversely affect her view of the case.

### 7. Claims of Instructional Error

Defendant contends the court committed three instructional errors.

#### a. Instruction Regarding Evidence of Uncharged Crime

Before evidence of the incident at Rod's Coffee Shop was presented to the jury, the court instructed the jury on the limited purpose for which it could consider the evidence. The court repeated the limiting instruction as part of its general instructions after all of the evidence was presented.

Specifically, the court instructed the jury it could consider the evidence only against defendant and not against his codefendants (who were not implicated in the incident). It also instructed that the evidence could not be considered "to prove that the defendant is a person of bad character or that he has a disposition to commit crimes." Instead, the jury could consider the evidence "only for the limited purpose of determining if it tends to show: The

identity of the person who committed the crime, if any, of which he is accused; that the defendant had knowledge or possessed the means that might have been useful or necessary for the commission of the crime charged; and the crime charged is a part of the larger continuing plan, scheme, or conspiracy." The court reiterated that the jury is "not permitted to consider such evidence for any other purpose." It also instructed the jury it could not consider the evidence unless it found by a preponderance of the evidence that defendant committed the uncharged crime, and it defined this standard of proof.

Defendant contends the instruction was erroneous in two respects. First, he contends the court should have limited the jury's consideration of the evidence to specified counts. He does not state exactly what counts these might be, but presumably he would limit consideration to only those counts involving use of the stun gun, or possibly all counts arising out of the Casa Gamino robbery.

 The argument is not cognizable on appeal because defendant did not request the court to limit use of the evidence in this way. The court has no sua sponte duty to give a limiting instruction. (Evid. Code, § 355; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 [16 Cal.Rptr.3d 880, 94 P.3d 1080].) Indeed, a criminal defendant might not want the court to pinpoint the exact counts to which the evidence was relevant. (*Hernandez*, at p. 1053.)

The contention also lacks merit. The evidence was admitted primarily for its relevance regarding the Casa Gamino robbery. Indeed, the court had initially indicated it would exclude the evidence if defendant conceded identity regarding that robbery. But the court did not have to explain this to the jury. In multiple-count cases, some of the evidence will primarily, sometimes exclusively, be relevant as to one or more, but not all, of the counts. For example, the testimony that one of the gunmen during the Outrigger Lounge robbery hit John Tucker with a shotgun, breaking two ribs, had little, if any, relevance to the charges arising out of the other robberies. But the court does not normally identify for the jury the counts to which the evidence is relevant. The jury can determine that for itself.

Once the evidence of the Rod's Coffee Shop incident was admitted, whatever prejudicial effect there might have been was realized, and the jury could consider it for any proper purpose. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1053; *People v. Carpenter, supra,* 15 Cal.4th at p. 382.) The court carefully delineated what those proper purposes were. Doing so provided sufficient guidance.

Second, defendant contends that, by instructing the jury it could consider the evidence only if it found by a preponderance of the evidence that he

committed the crime, and then defining this standard of proof, the court lowered the prosecution's burden of proof. We have repeatedly rejected this contention. The court also gave the jury the full panoply of standard instructions regarding the prosecution's burden of proof and the reasonable doubt standard. These instructions made clear to the jury that the prosecution had the burden of proving all ultimate facts beyond a reasonable doubt. (*People v. Virgil, supra*, 51 Cal.4th at pp. 1259–1260; *People v. Foster* (2010) 50 Cal.4th 1301, 1347–1348 [117 Cal.Rptr.3d 658, 242 P.3d 105].)

### b. *Instruction on Witness Identification*

The court gave CALJIC No. 2.92, the standard instruction regarding how the jury should consider eyewitness identification evidence. It said the jury should consider any factor that bears on the accuracy of the identification including, but not limited to, specified factors. One of the specified factors was "the extent to which the witness is either certain or uncertain of the identification."[7] (See CALCRIM No. 315 [among other factors, the jury should consider "[h]ow certain was the witness when he or she made an identification"].) Citing scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy, defendant argues the court erred in instructing the jury it could consider the certainty factor.

The Attorney General argues the claim is forfeited because defendant did not request that CALJIC No. 2.92 be modified. We agree. If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so. (*People v. Ward* (2005) 36 Cal.4th 186, 213 [30 Cal.Rptr.3d 464, 114 P.3d 717]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561 [59 Cal.Rptr.3d 876].) This conclusion is especially

---

[7] As given, the entire instruction pursuant to CALJIC No. 2.92 was as follows: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including but not limited, to any of the following:

"The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; the stress, if any, to which the witness was subjected at the time of the observation; the witness's ability, following the observation, to provide a description of the perpetrator of the act; . . . the extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; the cross-racial or ethnic nature of the identification; the witness's capacity to make an identification; evidence relating to the witness's ability to identify other alleged perpetrators of the criminal act; whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup; the period of time between the alleged criminal act and the witness's identification; whether the witness had prior contacts with the alleged perpetrator; the extent to which the witness is either certain or uncertain of the identification; whether the witness's identification is in fact a product of his or her own recollection; and any other evidence relating to the witness's ability to make an identification."

forceful here because, under the facts, it is not clear defendant would want the modification. This case involved many identifications, some certain, some uncertain. Defendant would surely want the jury to consider how *uncertain* some of the identifications were, as CALJIC No. 2.92 instructs. And defendant might be concerned about the difficulty of instructing the jury to consider how uncertain an identification was without also, at least implicitly, suggesting it should also consider how certain it was. Thus, in this case, it is unclear that defendant would want the court to delete the certainty or uncertainty factor from the instructions.

■■■ We also find no error and no prejudice. Studies concluding there is, at best, a weak correlation between witness certainty and accuracy are nothing new. We cited some of them three decades ago to support our holding that the trial court has discretion to admit expert testimony regarding the reliability of eyewitness identification. (*People v. McDonald* (1984) 37 Cal.3d 351, 369 [208 Cal.Rptr. 236, 690 P.2d 709].) In *People v. Wright* (1988) 45 Cal.3d 1126, 1141 [248 Cal.Rptr. 600, 755 P.2d 1049], we held "that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence." We specifically approved CALJIC No. 2.92, including its certainty factor. (*Wright*, at pp. 1144, 1166 [appendix].) We have since reiterated the propriety of including this factor. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

Defendant correctly notes that some courts have disapproved instructing on the certainty factor in light of the scientific studies. (E.g., *State v. Mitchell* (2012) 294 Kan. 469 [275 P.3d 905]; *Commonwealth v. Santoli* (1997) 424 Mass. 837 [680 N.E.2d 1116].) But, in a case like this involving uncertain as well as certain identifications, it is not clear that even those cases would prohibit telling the jury it may consider this factor. As the *Santoli* court noted, "It is probably true that the challenged instruction has merit in so far as it deals with the testimony of a witness who expressed doubt about the accuracy of her identification . . . ." (*Santoli*, 680 N.E.2d at p. 1121.) Any reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications.

We also see no prejudice to defendant. The instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy. In this case, telling it to consider this factor could only benefit defendant when it came to the uncertain identifications, and it was unlikely to harm him regarding the certain ones.

Moreover, the eyewitness identifications were far from the only evidence connecting defendant to the crimes. He was caught on videotape robbing

George's Market. He literally ran out of his shoe after robbing Ofelia's Restaurant. The ballistics evidence, together with other evidence, strongly showed that defendant was the gunman who fired shots during three of the robberies. Evidence connected him to a stun gun like the one used in the Casa Gamino robbery. Jewelry from some of the robberies was found concealed on his person when he was arrested. His car was connected to some of the robberies. It is true that not all of the seven robberies had evidence connecting defendant other than eyewitness identifications. But the similarity of the takeover robberies and the general descriptions of some of the gunmen strongly indicated the same group committed all of the robberies. Defendant was clearly a leader of that group, and he had a distinctive appearance among the robbers. The many identifications, together with the remaining evidence, strongly showed that defendant was present at each of the robberies. It is not reasonably probable defendant would have obtained a more favorable result had the trial court deleted the certainty factor. (*People v. Ward*, *supra*, 36 Cal.4th at p. 214.) Indeed, we would find giving the instruction harmless beyond a reasonable doubt.

### c. *Reasonable Doubt Instructions*

Defendant contends that a series of standard instructions the court gave undermined the reasonable doubt standard. (CALJIC Nos. 2.01, 2.21.1, 2.21.2, 2.22, 2.27, 8.83.) "[W]e have rejected this precise argument on occasions too numerous to recite. [Citations.] As we have explained, each of these instructions 'is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof.' [Citation.] Defendant invites us to revisit the issue, but provides no persuasive reason to do so." (*People v. Whalen* (2013) 56 Cal.4th 1, 70 [152 Cal.Rptr.3d 673, 294 P.3d 915].)

### C. *Penalty Issues*

#### 1. *Joint Trial*

■ Defendant moved to sever his trial from that of his codefendants several times before and during the trial. He also moved for separate penalty juries or sequential penalty trials. The court denied each motion.[8] Defendant contends the court erred. It did not. No good reason existed to try defendants separately, to use two penalty juries, or to conduct sequential penalty trials.

■ The applicable law is settled. The Legislature has expressed a preference for joint trials; therefore, two or more defendants jointly charged

---

[8] Some of these motions concerned severance of the trial of guilt. But defendant primarily, although not exclusively, claims prejudice as to penalty. Accordingly, we will consider the entire severance question together, as does defendant.

with crimes must be tried together unless the court orders separate trials. (Pen. Code, § 1098; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378 [178 Cal.Rptr.3d 185, 334 P.3d 573].) Joint trials promote efficiency and help avoid inconsistent verdicts. (*Zafiro v. United States* (1993) 506 U.S. 534, 537 [122 L.Ed.2d 317, 113 S.Ct. 933]; *Bryant, Smith and Wheeler*, at pp. 378–379.) "[I]mportant concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against [the] ensuing charges." (*Bryant, Smith and Wheeler*, at p. 379.) The court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial. (*Ibid.*) Prejudicial association might exist if "the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue." (*Id.* at p. 383.) We review the court's denial of severance for abuse of discretion based on the facts as of the time of the ruling. If the court properly denied severance at the time, the reviewing court may reverse a judgment only if it finds that the joint trial caused gross unfairness that denied due process. (*Id.* at p. 379.)

Defendant was charged with all of the crimes, making this a "classic case for a joint trial." (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 379.) Virtually no reason existed for severance. There was no incriminating confession; defendant was not prejudiced by his association with the co-defendants; defendant was charged with all counts, so severance would not have resulted in fewer counts; there were no conflicting defenses; and there was no suggestion that a codefendant would have given exonerating testi-mony at a separate trial. Rosa S. did testify that Navarro told her, in defendant's absence, that defendant had shot the police officer. The court admonished the jury not to consider that evidence as to defendant. But she also testified that defendant said the same thing to her, so this circumstance could not have prejudiced defendant, and certainly did not warrant severance.

Defendant asserts that the prosecution repeatedly claimed at trial that the three codefendants were equally culpable when, in fact, it always intended to portray him as the most culpable. The record does not support the assertion and, in any event, the argument supplies no reason for the court to order severance. Joinder is not limited to cases in which each defendant is equally culpable.

The prosecution did contend that codefendants Contreras and Navarro were legally *guilty* of the crimes to the same extent as defendant. But it did not

portray each defendant as equally culpable. The prosecution did portray defendant as the most culpable of the three defendants. This was due to the evidence, not to joinder. The evidence showed it was defendant who assumed a leadership role among the robbers. It was defendant who shot Officer Hoglund three times. It was defendant who chased Lee Chul Kim into the meat freezer and, with Contreras, shot him to death. It was defendant who tortured Armando Lopez and then Maricella Mendoza with a stun gun to try to force Lopez to open the safe at Casa Gamino. It was defendant who fired a gun during the robbery at Ofelia's Restaurant. The evidence would have shown defendant was the most culpable at a separate trial just as surely as at a joint trial.

■ Defendant also argues that, because the codefendants' cases in mitigation were supposedly stronger than his own, he was prejudiced by joinder of the penalty trial. "The trial court must exercise its broad discretion to resolve motions to sever the penalty phases of jointly tried codefendants [citation] in a manner consistent with 'the need for individualized consideration as a constitutional requirement in imposing the death sentence' [citations]." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196 [112 Cal.Rptr.3d 746, 235 P.3d 62], quoting *Lockett v. Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 98 S.Ct. 2954].) This record provides no suggestion the jury failed to give individualized consideration to defendant's proper sentence. "[I]t is not surprising that different defendants presented different mitigating evidence regarding their backgrounds. That circumstance alone clearly cannot establish that the jury failed to give each defendant individualized consideration." (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 384.)

The court instructed the penalty jury it was its duty "to render an individualized determination about the appropriate penalty," and it "must now determine which of said penalties shall be imposed on each defendant." It instructed on the factors to consider "in determining which penalty is to be imposed on each defendant." It also instructed that "you must decide separately the question of the penalty as to each of the defendants. If you cannot agree upon the penalty to be inflicted upon all the defendants, but you do agree on the penalty as to one or more of them, you must render a verdict as to the one or more upon which you do agree." In fact, the jury could not agree on a penalty verdict as to the codefendants, but it did agree on one as to defendant. All of these circumstances show that the jury gave defendant's penalty individualized consideration. (*People v. Letner and Tobin, supra,* 50 Cal.4th at pp. 196–197.)

■ A recent high court opinion supports this conclusion. (*Kansas v. Carr* (2016) 577 U.S. ___ [193 L.Ed.2d 535, 136 S.Ct. 633].) "Joint proceedings

are not only permissible but are often preferable when the joined defendants' criminal conduct arises out of a single chain of events. Joint trial may enable a jury 'to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to assign fairly the respective responsibilities of each defendant in the sentencing.' [Citation.] . . . To forbid joinder in capital-sentencing proceedings would, perversely, *increase* the odds of 'wanto[n] and freakis[h]' imposition of death sentences. [Citation.] Better that two defendants who have together committed the same crimes be placed side-by-side to have their fates determined by a single jury." (*Id.* at p. ___ [136 S.Ct. at pp. 645–646].)

For similar reasons, the court acted within its discretion in denying the motions for separate penalty juries or sequential penalty trials. (*People v. Bennett* (2009) 45 Cal.4th 577, 599–600 [88 Cal.Rptr.3d 131, 199 P.3d 535]; *People v. Taylor* (2001) 26 Cal.4th 1155, 1173–1174 [113 Cal.Rptr.2d 827, 34 P.3d 937].) As defendant notes, at trial, Contreras's attorney argued in support of sequential penalty trials that "there will be no victim impact [evidence], so there will be no repetition with respect to witnesses coming back to testify."[9] But this circumstance also presents no reason to conduct separate penalty trials.

In short, the joint trial was not unfair to defendant at all, much less grossly unfair. The court acted within its discretion in implementing the legislative preference for conducting joint trials.

### 2. Admitting One of Defendant's Statements

Defendant objected to admitting Rosa S.'s testimony that during the conversation in which he said he had shot a police officer he also said "he had already killed eight or nine people in his country." The court ruled the evidence inadmissible at the guilt phase under Evidence Code section 352, finding its prejudicial effect outweighed its probative value. But the court also ruled the prosecution could admit the statement at a penalty trial as evidence of the circumstances of the crime under Penal Code section 190.3, factor (a). Defendant's attorney stated that, in that event, he would prefer the statement be presented at the guilt phase rather than have the jury hear it for the first time at the penalty phase. Later, defendant renewed his objection, this time arguing that a transcript of the statement Rosa S. gave to the police was ambiguous as to whether it was defendant or someone else who had made the statement. Noting that the transcript of her preliminary hearing testimony resolved any ambiguity, the court reiterated its ruling.

---

[9] Counsel did not explain why he believed there would be no victim impact evidence, but, in fact, the prosecution presented none.

Accordingly, the jury heard about the statement at the guilt phase both during the playing of the taped statement and during the reading of Rosa's preliminary hearing testimony. When the jury first heard the evidence, the court admonished it that defendant's "comments about having killed eight or nine people is not offered for the truth of the matter. There's no evidence to support that there were eight or nine people or anybody else killed. It is offered simply for your consideration as to the declarant's state of mind at the time the statement was made, not for the truth of that fact."

Defendant contends the court erred in ruling the evidence admissible at the penalty phase. Because Rosa's initial taped statement was somewhat ambiguous as to who exactly made the statement, he first argues the evidence was unreliable. However, as the trial court noted when it overruled defendant's objection on this basis, any ambiguity in the taped statement was clarified during her testimony. She testified specifically that defendant made the statement. No reason appears to exclude the statement on this basis.

Defendant also argues the statement was unduly prejudicial, as there was no evidence he did actually kill several other people. It is true that no such evidence exists. But the court did not admit the statement for its truth, and it admonished the jury in this respect. The statement, made in the same conversation in which defendant said he had shot Officer Hoglund, was relevant to show defendant's cavalier attitude towards his killing of the officer.

We upheld the admission of a similar statement in *People v. Michaels* (2002) 28 Cal.4th 486 [122 Cal.Rptr.2d 285, 49 P.3d 1032]. In *Michaels*, the trial court excluded at the guilt phase the defendant's "claim[] that he was a contract killer and had committed 10 to 15 contract killings," but it admitted the statement at the penalty phase over objection. (*Id.* at p. 533.) The trial court gave a limiting instruction similar to that in this case, explaining that the statement was " 'offered on the issue of his mental state and motive on the nature and circumstances of the present offense, and not for the truth of whether there were other homicides.' " (*Ibid.*) The court told the jury "not to consider such evidence 'for any purpose except the limited purpose for which it is admitted.' " (*Ibid.*) The evidence "was offered under [Penal Code] section 190.3, factor (a), as part of the circumstances of the charged murder, not under factor (b). The trial court here told the jury it could not consider defendant's confession as proof that he had committed other homicides. The prosecution did not claim defendant had committed any contract killings or planned to do so. The evidence was admitted solely to show defendant's attitude and motive in connection with the charged murder and, so limited, was properly admitted." (*Id.* at p. 534.)

■ We rejected the defendant's argument the trial court should have excluded the statement as unduly prejudicial under Evidence Code section 352. We explained that, although the court may not exclude *all* Penal Code section 190.3, factor (a) evidence at the penalty phase, it "retains a limited discretion" to exclude such evidence, including specific items of evidence that might be " 'misleading, cumulative, or unduly inflammatory.' " (*People v. Michaels, supra,* 28 Cal.4th at pp. 534–535.) However, we found no abuse of discretion in admitting the evidence. "The prejudicial effect of the evidence was that it might lead the jury to believe that defendant had committed other murders or planned to do so. But in view of the prosecutor's avoidance of any such claim, the absence of any evidence to support it, and the trial court's limiting instruction, it is far more likely that the jurors would recognize the defendant's actions as mere braggadocio. Thus the trial court could reasonably conclude that, as long as it gave limiting instructions, the probative value of the evidence at issue would outweigh its prejudicial effect." (*Id.* at p. 535.)

This case is similar. There was no evidence defendant had actually killed in addition to the charged murders, and the court gave a limiting instruction. Defendant argues, however, that, unlike *People v. Michaels, supra,* 28 Cal.4th 486, here the prosecutor did *not* avoid any claim that he had committed other murders. When he cross-examined defendant regarding his professed religious conversion in jail, the prosecutor asked, "Did you feel especially in a humorous mood as you recalled killing those eight or nine other people that you had killed?" When defendant asked which killings, the prosecutor responded, "the ones that you talked about when you were giggling and laughing over killing the officer." Defendant denied making the statement and denied ever speaking with Rosa S. Defendant did not object at the time.

Later, outside the jury's presence, defendant's attorney argued that "the prosecutor asked the question with the force and effect as if he knew that to be the truth." The court agreed and stated that it would have sustained an objection at the time had defendant made one. It found the first sentence inappropriate, although it believed the follow-up question (referring to what defendant had talked about) was appropriate. At defendant's request, it also agreed to give the jury a further limiting instruction. In the jury's presence, it explained that "there was some reference when [defendant] was on the stand where [the prosecutor] asked about the statement about killing eight or nine people before. I want to remind you that that statement was offered not for the truth of the eight or nine people being killed, there is no such evidence, but it was admitted for your consideration as to the state of mind, if you believe that statement was made, offered only for the state of mind, not for the truth of eight or nine people being killed. There is no such evidence. I want to make sure you remember that admonition that you heard back at the guilt phase."

To the extent the prosecutor's first question suggested defendant had, in fact, committed other killings, the suggestion was improper. But the second question made clear the first question was based only on what defendant had said. The general questioning about defendant's attitude towards the crimes was appropriate. The court's firm second admonition made clear to the jury it was not to consider the statement for the truth and that no evidence supported it. Defendant requested a stronger admonition, but, under the circumstances, the actual admonition was sufficient to cure any harm. The court acted within its discretion in treating the matter as it did.

### 3. *Admission of Other Crimes Evidence*

Over defendant's objection, the court ruled that the jury could consider at the penalty phase the evidence of the 1990 incident at Rod's Coffee Shop under Penal Code section 190.3, factor (b) (criminal activity involving force or violence). The court found the evidence sufficient to warrant the jury's finding of an attempted robbery or possession of a stun gun, or both. Regarding attempted robbery, it explained: "Where we have the entry to the restaurant, an obvious artificial presence there, the mingling in the back even after there was no reason for them to remain, the location of the cars, one blocking the driveway and . . . the other in an unusual location, . . . plus the possession of the weapons, there's more than enough to show they have gone beyond the mere planning stage."

Accordingly, the court instructed the jury that "evidence has been introduced for the purpose of showing that the defendant . . . has committed the following criminal acts relating to Rod's Coffee Shop: These being attempted robbery and possession of a stun gun, such acts which involved the express or implied use of force or violence or the threat of force or violence." It also instructed the jury on the reasonable doubt standard it had to employ in considering the evidence.

Defendant contends the court erred in permitting the jury to consider the evidence in this way. He argues that there was insufficient evidence to support a jury finding that defendant committed an actual crime involving force or violence. We disagree. The court's ruling is reviewed for abuse of discretion. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1127 [116 Cal.Rptr.3d 723, 240 P.3d 204].)

█ Penal Code section 190.3, factor (b), allows the penalty jury to consider evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The court acted within its discretion in permitting the jury to consider the evidence both as an attempted robbery and as possession

of a stun gun. Sufficient evidence existed that he committed both crimes, and that both crimes involved force or violence.

 Attempted robbery requires the "specific intent to commit robbery and . . . a direct but ineffectual act toward the commission of the crime." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].) Under the circumstances, especially in light of later events, the jury could easily find defendant intended to commit robbery. The jury could also find the required direct act. "The crime of attempted robbery requires neither the commission of an element of robbery nor the completion of a theft or assault." (*Id.* at p. 28.) "The act required must be more than mere preparation, it must show that the perpetrator is putting his or her plan into action. That act need not, however, be the last proximate or ultimate step toward commission of the crime." (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764 [95 Cal.Rptr.2d 642].)

In *Bonner*, the defendant "was never in close proximity to either victim and made no demand on either for money." (*People v. Bonner, supra,* 80 Cal.App.4th at p. 763.) Instead, he "went armed to the scene, placed a mask over his face, [and] waited in hiding moments before his victim's approach," at which point he was discovered. (*Id.* at p. 764, fn. 3.) The appellate court found this sufficient evidence of the requisite direct act. (*Ibid.*; see *People v. Dillon* (1983) 34 Cal.3d 441, 456 [194 Cal.Rptr. 390, 668 P.2d 697] [sufficient evidence of attempted robbery when the would-be robbers armed and disguised themselves, approached but did not enter the targeted marijuana field, passing " 'no trespassing' signs" on the way, and then watched for their opportunity]; *People v. Vizcarra* (1980) 110 Cal.App.3d 858, 861–863 [168 Cal.Rptr. 257] [sufficient evidence of attempted robbery when the defendant approached a liquor store with a rifle and attempted to hide on a pathway adjacent to the store when a customer observed him].) Here, the evidence showed that the five men, including defendant, were armed, arrived at the coffee shop, positioned a car to make a quick getaway, and actually entered the coffee shop. They went outside but then lingered until the proprietor called the police. This evidence was enough for a jury to find the necessary act beyond mere preparation.

 The evidence was also sufficient to find that defendant possessed the stun gun. It was under the passenger seat of the car he was driving. Defendant suggests he might not have known the stun gun was there. But, under all of the circumstances, including the later events in which defendant was clearly a leader and actually used a stun gun, the jury could have reasonably concluded defendant did not drive the car unaware of the stun gun under the seat. There was also sufficient evidence of an implied threat to use force or violence. "Possession of a firearm is not, in every circumstance, an

act committed with actual or implied force or violence. [Citation.] The factual circumstances surrounding the possession, however, may indicate an implied threat of violence." (*People v. Bacon, supra,* 50 Cal.4th at p. 1127; see *People v. Elliott* (2012) 53 Cal.4th 535, 586–587 [137 Cal.Rptr.3d 59, 269 P.3d 494].) The same is true of possession of a stun gun. Here, the circumstances support a jury finding that defendant possessed the stun gun with an implied threat to use force or violence.

### 4. Replacement of Interpreter

Defendant testified on his own behalf at the penalty phase with the assistance of an interpreter. After a break at midday, outside the jury's presence, one of the defense attorneys stated that he was informed the prosecutor had "verbally attacked" the interpreter "in the way that she was conducting the interpretation." The court said, "It was brought to my attention and I agree. I will have to admit in the translation the tone of voice has been entirely different for the questions directed by the D.A. as opposed to the responses. The interpreter was literally shouting the questions. Mr. Grosbard's voice was high, but she was shouting the questions Grosbard asked in an entirely different tone than the responses by the defendant." The court decided to change interpreters. It explained that "[t]he interpreter should just be interpreting, there should be no hand motions, simply the interpretation without a change in voice. The change in voice could affect the jury in some way to hurt your client, too, and I wasn't comfortable with it either, so it was brought to my attention. Mr. Grosbard apparently did have a conversation. At this point I would like to switch, keep her in here because we need her, and I don't see any problem with the interpretation, but I did notice the change in her voice."

The court overruled defendant's objection to changing interpreters, explaining that "we have three interpreters in here. When we don't have somebody on the stand we have two, they are constantly switching off. I don't see anything that will telegraph anything to the jury. They are constantly switching." Later, in denying defendant's new trial motion based on the change of interpreters, the court added that "no defendant or no witness has a right to have an interpreter act out for them their emotions and certainly what the court saw was great emotion invested in the interpreter's interpretation. There were gestures totally inappropriate and unprofessional. Certainly the interpreter who substituted for the interpreter we did have at the time was very professional. And I didn't see anything improper about the actual interpretation, there was nothing with the words, it was the inflection, the emotional addition to the statements, as well as the gestures."

Defendant contends the court erred in violation of various constitutional rights in replacing one interpreter with another. We disagree. The trial court did not abuse its discretion when it replaced an interpreter it believed was acting inappropriately.

■■■ Certainly, a criminal defendant who needs one has a constitutional right to an interpreter. (Cal. Const., art. I, § 14; *People v. Romero* (2008) 44 Cal.4th 386, 410 [79 Cal.Rptr.3d 334, 187 P.3d 56]; *People v. Aguilar* (1984) 35 Cal.3d 785, 790 [200 Cal.Rptr. 908, 677 P.2d 1198].) But the right is to a *competent* interpreter, not to a particular interpreter. (*People v. Aranda* (1986) 186 Cal.App.3d 230, 237 [230 Cal.Rptr. 498].) "The question of an interpreter's competence is a factual one for the trial court." (*Ibid.*, citing *People v. Mendes* (1950) 35 Cal.2d 537, 543 [219 P.2d 1], and *People v. Roberts* (1984) 162 Cal.App.3d 350, 355 [208 Cal.Rptr. 461].) We have no basis on this record to overturn the court's determination that the interpreter should be replaced.

Citing the Judicial Council's Professional Standards and Ethics for California Court Interpreters, defendant argues that an interpreter is supposed to include some of the witness's intonation. According to those standards, "Triers of fact need to have a clear understanding of emotions such as anger, fear, shame, or excitement that are expressed by witnesses. People convey their emotions not only in words but also in facial expressions, posture, tone of voice, and other manifestations. These nonlinguistic means of expression are very closely tied to culture and language, so when people do not speak the same language they may misunderstand the emotional content of a message. The court interpreter should strive to preserve this element of emotion through moderate voice modulation. . . . However, refrain from any kind of dramatics. Interpreters are not actors and should not become the center of attention. . . . The key is moderation." (Professional Standards and Ethics for Cal. Court Interpreters (5th ed. 2013) p. 10 (Professional Standards).)

Defendant contends the interpreter was merely acting within these standards. To the extent the trial court believed the interpreter should never change the tone of voice, these standards indicate otherwise. But the court still had discretion to conclude the interpreter was acting unprofessionally. The standards state that moderation is key. The court may have believed the interpreter's actions were excessive, not moderate. The court was also concerned with the interpreter's gestures, finding them "totally inappropriate and unprofessional." This concern was appropriate. The Professional Standards instruct interpreters not to "reproduce any gestures used by the witness

or attempt to replace them with target-culture equivalents. That only complicates matters, potentially mischaracterizing the testimony." (Professional Standards, *supra*, at p. 11.) We see no abuse of discretion in replacing the interpreter.

Replacing one interpreter with another was also harmless beyond a reasonable doubt. (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010 [232 Cal.Rptr. 132, 728 P.2d 202].) Defendant argues that the court erroneously instructed the replacement interpreter simply to interpret "without change of voice," and that this placed him at a disadvantage, as he could not appreciate the emotional quality of the prosecutor's questions. We disagree. The record shows defendant understood the thrust of the questions and responded appropriately. At one point, for example, when the prosecutor questioned him closely, and possibly sarcastically, about his claimed religious conversion in jail, he responded, "I don't understand why it is that you want to confuse me. I have said one thing. I said that once I came to know Christ, and I had the revelation about his death, I understood truly that the value of life is infinite. Prior to that I didn't have that knowledge. Prior to that, I didn't value life. Had I had that knowledge, had I valued life, I wouldn't have done what I did." When it denied defendant's new trial motion, the court stated that the replacement interpreter was "very professional." On this record, we have no basis to find otherwise. (*Id.* at p. 1015.) Providing defendant with a competent interpreter complied with his constitutional rights.

### 5. *Cross-examination of Defendant*

 Defendant testified at the penalty phase. He contends the court erred in two respects in the scope of cross-examination it permitted. The relevant general legal principles are settled. "Once the defense has presented evidence of circumstances admissible under factor (k) [of Penal Code section 190.3], . . . prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) "[T]he scope of rebuttal lies within the trial court's discretion." (*People v. Friend* (2009) 47 Cal.4th 1, 87 [97 Cal.Rptr.3d 1, 211 P.3d 520].) "A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1147 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

First, defendant objected to any cross-examination regarding the crimes themselves. He argued that his testimony on direct examination would be limited to his postcrime religious conversion and his "dealing with the realization of what he had done and acceptance of personal responsibility for

what he had done," and that, therefore, cross-examination regarding the crimes themselves would be improper. The court overruled the objection, finding that the People "have a right to explore what it is he is feeling remorse about, and that includes covering the specifics of the crimes." Later, the court explained further that the prosecution had the right to "test the sincerity of what he is doing now." In light of the court's ruling, defendant testified on direct examination that he shot and killed Kim and Officer Hoglund, but he said he shot Kim only after Kim shot him in the leg. On cross-examination, he admitted participating in the robbery at the El 7 Mares Restaurant, but denied being present during the robbery of the Outrigger Lounge. He denied bringing a stun gun to the Casa Gamino robbery but said someone handed one to him during the robbery. He denied using the stun gun on Maricella Mendoza, although he admitted using it on Armando Lopez because "he didn't cooperate."

The court's ruling permitting this questioning came within its discretion. When a defendant presents evidence of his religious conversion in jail, the prosecution is entitled to test the sincerity of this conversion. (*People v. Friend, supra,* 47 Cal.4th at pp. 88–89; *People v. Montiel* (1993) 5 Cal.4th 877, 932–933 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) "No constitutional principle precludes examination of a witness about the sincerity and depth of religious and remorseful feelings he himself has placed in issue." (*Montiel,* at p. 934.) An obvious, and permissible, method for the prosecution to test the sincerity of defendant's claimed religious conversion was to question him about his attitude towards his crimes.

Second, defendant testified on direct examination that he shot Kim only after Kim shot him first. On cross-examination by Deputy District Attorney Grosbard, he testified that after the Woodley Market shooting he "went to the Good Samaritan hospital, and there they took care of me." But no one removed the bullet from his leg. Defendant also testified that he had recently had X-rays taken. Grosbard asked, "Are you sure you didn't get shot somewhere in the period between December 31, 1991 and April 18, 1992?" Defendant replied, "I am sure it wasn't then." At defense request, a conference was held outside the jury's presence.

During the conference, Grosbard stated, "I have a good faith basis for asking that, your Honor. There is a big time gap and we know of a shooting he is connected to during that time." Defense counsel objected that "the prosecution is trying to get other crimes and evidence in." The court said, "I don't see how you can keep the People from suggesting that bullet was acquired some other time." Referring to X-rays, the court asked defense counsel whether there were any records from the hospital "that are consistent with the bullet shown on those X-rays?" Defense counsel responded, "No." In

that event, the court observed, "How can I not let him cross-examine on that? You want all of us to take his word and not allow any cross-examination where there is no record to support his position. It's his word. I think the People have a right to challenge that word." Grosbard said his good faith belief was based on newspaper articles about a shooting in February 1992.[10] The court responded that it would not allow the prosecutor to go into the newspaper articles.

In front of the jury, Grosbard asked defendant, "Were you involved in a shoot-out in February of 1992 in which you may very well have received that gunshot wound?" Defense counsel objected. The court sustained the objection and asked the prosecutor to rephrase the question. Grosbard then asked, "Were you involved in the shoot-out during the time period, between December 31, 1991, and April 18, 1992?" Defendant said he was not involved in the shootout the prosecutor was talking about. Defense counsel asked to approach the bench. The court denied permission and directed Grosbard to ask his next question. Grosbard moved on to another topic.

Later, defendant presented evidence that approximately two weeks before defendant began testifying, X-rays were taken of him showing what appeared to be a bullet in his right leg. The witness identifying the X-rays did not know the caliber of the bullet and could not say how old it was.

For the reasons the court stated, it properly permitted the prosecution to ask defendant a general question about the possibility he received the bullet wound on some occasion other than during the Kim shooting. The court sustained defendant's objection regarding the specific date that was apparently based on the newspaper articles. Defendant denied participation in any such shootout, and the matter was never pursued. Even if the prosecutor should not have asked the more specific question, no prejudice ensued. The court sustained defendant's objection, and the point was minor in light of the trial as a whole.

### 6. Claims of Prosecutorial Misconduct

■■■ Defendant contends the two prosecutors committed several acts of misconduct. The use of deceptive or reprehensible methods to persuade the jury constitutes misconduct. To preserve a claim of misconduct, the defendant must object in a timely fashion and request an admonition. A claim of

---

[10] The prosecutor was apparently referring to Honduran newspaper articles about a shootout in that country in which defendant was allegedly involved. At one point earlier in the proceedings, the court ruled that, without more evidence, the prosecutor could not ask questions about the articles. But it permitted the prosecutor to renew the matter based on the actual evidence defendant presented.

misconduct is preserved for review only if an admonition would not have cured the harm. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [144 Cal.Rptr.3d 757, 281 P.3d 834].) The Attorney General argues that defendant has forfeited some of the current claims. Except as specifically noted below, we find the claims cognizable. Defendant generally, and sometimes repeatedly, objected to the cited misconduct on the grounds urged on appeal. The court overruled some, although not all, of the objections, thus making a further request for an admonition futile as to those objections. We discuss each claim of misconduct in order.

(a) Defendant reiterates his argument that the prosecutor improperly suggested in cross-examining him that he had actually committed the eight or nine killings in his own country that he had mentioned to Rosa S. (See pt. II.C.2., *ante*, p. 466.) The court's two admonitions cured any improper suggestion. Defendant also argues that the prosecutor's questions on cross-examination regarding whether he had been shot on some occasion other than during the Woodley Market robbery (see pt. II.C.5., *ante*, p. 473) further suggested he committed the eight or nine killings. It did not. The two points were separate. Vaguely referring to a shootout in some undisclosed place in which defendant might have received the bullet in his leg is entirely different from suggesting defendant committed several killings in his own country.

Defendant also argues that the cross-examination of his sister, Argentina Sanchez, who testified as a witness in mitigation, further improperly suggested he had killed people in Honduras. It did not. This sister testified about defendant's childhood in Honduras. She testified that during that time, because their parents had separated, she "was like a mother to him." She also testified that "we make mistakes" and asked the jury to spare defendant's life so "he can serve other people through the work of God." On cross-examination, to establish how well she had known defendant in recent years, the prosecutor asked her when she had last seen defendant. Over defendant's objection, the court permitted the prosecutor to elicit that she had last seen him in 1992 at her mother's house in Honduras, and that before that he had only sent her two letters from the United States. It sustained objections regarding additional details. We see no impropriety.

(b) Next, defendant contends the prosecutor committed misconduct by violating certain court rulings. To fully understand the contention, a detailed review of the relevant record is required.

Before he testified, defendant's attorney stated that he would not answer any questions regarding who else was involved in the crimes and the roles of the codefendants. The prosecutor argued "that such questions would in fact test the defendant's sincerity as to having a clean slate in life. The fact that he

accepts for himself what was done was wrong must be buttressed in order to show sincerity by the fact that everybody else who was involved did wrong. And if he was not willing to say what these other people have done and their roles, their names, their locations, things like that, then it shows he is not in fact sincere in his religious beliefs. It goes directly to his sincerity." The court ruled that if defendant refused to answer such questions, it would not hold him in contempt, but the prosecution "can take advantage of that in argument and I think the defense can then handle it the way they want to."

At this point, counsel for codefendant Navarro objected to questions about Navarro. The prosecutor argued that such questions would be proper. The court ruled that the prosecutor could "ask about what he did, you can't ask what the others did. You can ask him to indicate what he did . . . , no cross-examination to the extent that we are asking the jury to separate the three of them. It makes it difficult to separate the three when you start attacking the other defendants, use Mr. Sanchez. So, no, you can't do it."

At one point during defendant's cross-examination, the prosecutor asked whether defendant had "made a choice to kill Officer Hoglund in order for you to make an escape, for you and your compadres." When counsel for Navarro objected, the court said to "limit it to just Mr. Sanchez." Later, outside the jury's presence, the prosecutor stated his intent to ask defendant about "who did you do the other robberies with other than the two men in court." The court ruled he could not do so, stating, "That gets into something other than himself and I don't think the relevance of his remorse. Just leave it alone. When we originally talked, it was just as to these defendants. I don't see anything to be gained by asking about anybody else involved other than him. I know it was said differently before, but as I think about it, the whole point of the penalty phase is to determine his culpability."

During further cross-examination, the prosecutor asked defendant whether he had "provided any information to any investigators in this case in an attempt to get the dangerous men who assisted you in the robbery and killing of Officer Hoglund so those investigators could go find them and arrest them." When counsel for defendant asked to approach the bench, the court said the objection was sustained. The prosecutor then asked, "Have you provided any information to get these people?" The court said, "It's the same question. Just go on to something else." Later, the prosecutor asked whether defendant had "split the money evenly with the other people who participated in the robberies." The court sustained defendant's objection "to the form of that question." When the prosecutor next asked whether defendant had gotten "a fair share of the money," a conference was held outside the jury's presence.

Defendant's attorney asked the court to hold the prosecutor in contempt. The court denied the request, ruling that the way the prosecutor rephrased the question was appropriate. Counsel for Contreras objected to the prosecutor's arguing from this questioning how much Contreras's share was. The court ruled, "Maybe you cannot editorialize by taking out the 'fair,' but I think that is not a bad question, what did you get."

Later during defendant's cross-examination, the prosecutor asked where he had gone after the Woodley Market shooting. Defendant responded that he went to some friends' home, specifically the Umana family's home. The prosecutor asked, "Isn't that one of your partners in crime, Carlos Umana?" At this point, another conference was held outside the jury's presence. Counsel for defendant again asked the court to find the prosecutor in contempt. The court denied the request. It explained, "I reversed my ruling as the jury was walking in. Earlier I did indicate you [the prosecutor] would be allowed to ask about the other persons. I rethought that. Even though it may not affect the other defendants here on trial, I am a little concerned about overlap over the other defendants and keeping it separate. And for you to ask a question involving others, you are risking the danger of having the defendant include the other defendants. So if he talks about friends, leave it alone, or anybody else involved, and just ask what he did." The court stated it found no reason to find the prosecutor in contempt: "The defendant did make reference to going to a friend's house and there is a certain point—the D.A. does have a right to cross-examine, but you are stepping into areas that may affect the others, so stay away from anything that related to anybody other than himself."

Still later during defendant's cross-examination, after defendant testified that someone else had brought the stun gun to the Casa Gamino robbery, the prosecutor asked, "Did you ask to borrow it for a moment while you tortured those people?" The court sustained counsel for Navarro's objection to the question "as phrased." It permitted the prosecutor to ask, "You knew that stun gun had been brought to that location, didn't you?"

During the cross-examination of Arturo Talamante, the coordinator of the ministry of prisons, who testified about defendant's religious conversion, the prosecutor asked, "Did the defendant tell you why he has done nothing to help the authorities to bring his other accomplices to justice?" The court sustained defendant's objection, and the matter was not pursued.

Defendant argues that by asking these questions, the prosecutor repeatedly violated the court's rulings against cross-examining him about the actions of others. We disagree. The prosecutor was entitled to test the sincerity of defendant's professed religious conversion by rigorous cross-examination. In

so doing, of course, he was not entitled to violate rulings the court had already made. But he did not do so. As the trial court found in denying defendant's repeated attempts to have the prosecutor found in contempt, the questions defendant complains of did not violate its previous rulings.

Apparently concerned about possible unfairness to the codefendants, the court originally ruled the prosecutor could not ask defendant about what the codefendants had done, but it permitted questioning about participants other than the codefendants. Later, it expanded the prohibition to include questions about the actions of any of the participants. These are the rulings defendant claims the prosecutor violated. The court sustained objections to some of the questions, and, as to those questions, defendant did not request an admonition. As an admonition would have cured any harm caused by a specific question, defendant has forfeited the narrow claim that the particular question was misconduct. But he has preserved the broader claim that the prosecutor repeatedly violated court rulings. He objected repeatedly on that point.

The prosecutor's question about whether defendant had made the choice to kill Officer Hoglund in order for him and his "compadres" to escape did not violate these rulings. The question merely asked defendant about his own motivation and did not ask what the codefendants had done. In any event, the court told the prosecutor just to limit the question to defendant.

The questions regarding whether defendant had provided any information about the identities of the other participants also did not violate the rulings. The questions asked only about defendant's own action or inaction. They did not ask about the actions, or even identities, of anyone else. They seemed appropriate to test the sincerity of defendant's claimed religious conversion. The court did not explain why it sustained the objection, but the prosecutor could not be faulted for not anticipating that the court would do so. The same is true of the prosecutor's questions regarding whether defendant had split the money evenly. When defendant testified that he had gone to the Umana family home, asking whether that was the home of one of his partners in crime also did not violate the ruling, although this question is a bit closer. The question seems relevant to proper cross-examination, and the court acted properly in not finding any reason to find the prosecutor in contempt. In any event, the question could not have prejudiced defendant. The same is true of the question about whether defendant had asked to borrow the stun gun. The court sustained the objection to the question as phrased but permitted the follow-up question as to whether defendant had known the stun gun had been brought to that location. This latter question was clearly proper cross-examination, thus making the previous question innocuous.

Finally, the questioning of Talamante did not violate any court order. The orders concerned cross-examination of defendant, not someone else. The

prosecutor asked Talamante nothing about the actions of others, but only about defendant's actions. The question also seemed appropriate to test the validity of Talamante's testimony regarding defendant's professed religious sincerity. The court did not explain why it sustained the objection, but we see no misconduct in asking the question. In any event, the matter was not pursued.

(c) Defendant claims the prosecutor improperly contacted the court ex parte in connection with the events leading to the replacement of the interpreter. (See pt. II.C.4., *ante*, p. 471.) He bases the claim on the following portions of the record. After a lunch break during defendant's cross-examination, the prosecutor, Grosbard, stated: "Your honor, we understand we were going to have a different interpreter this afternoon." Counsel for codefendant Contreras stated that the interpreter had approached him during the lunch hour and said that the prosecutor had "verbally attacked her in the way that she was conducting the interpretation. . . . He threatened her in terms of taking her off the case, or something to that effect." He said that if the prosecutor had any problems "he should bring it to your [the court's] attention." The court responded, "It was brought to my attention and I agree." The court went on to replace the interpreter.

Based on this record, defendant concludes there must have been some sort of improper ex parte communication between the prosecutor and the court during the lunch break. The claim is forfeited because defendant did not object on this point (although he did object to replacing the interpreter). The record could have been clarified, and any impropriety quickly cured, had defendant objected to any perceived improper communication.

The record also does not support the contention. The court did not indicate when or how, or by whom, "[i]t" was brought to its attention, or even exactly what "it" was. No reason exists to believe there was an improper ex parte communication between the prosecutor and the court rather than some other way "it" was brought to the court's attention. No one present, including defendant's attorney, apparently believed any improper communication had occurred. In any event, because the parties had the full opportunity to litigate the propriety of replacing the interpreter, and the replacement was neither erroneous nor prejudicial, any assumed communication was harmless beyond a reasonable doubt.

(d) Defendant contends the prosecutor sometimes acted unprofessionally and sarcastically. At one point during defendant's cross-examination, his attorney asked for a conference outside the jury's presence. He asked the court "to admonish the prosecution to calm down a bit" and explained, "I think that the theatrics is in effect an attempt by him to testify, to tell the jury

how disgusted he is by my client." He also complained that the prosecutor was sometimes sarcastic in the cross-examination. The court refused to make any order, but told the prosecutor, "You can cut back on the editorializing. Just ask the questions and save it for argument." The prosecutor responded, "I will." Defendant's attorney also objected that "there's comments back and forth between the two district attorneys in the court" that constituted "public displays of their thoughts on the testimony." The court overruled that objection, noting that "they're quietly conferring. I don't see that as a public display any more than I see consultation between [the defense attorneys]."

On another occasion, after a morning recess, counsel for codefendant Contreras asked the court to "admonish Mr. Grosbard when he is finished with witnesses, a simple 'no more questions' will suffice rather than this reported oral indignation." The court responded, "I will remind both of you, Mr. Leonard [Contreras's attorney] as well as Mr. Grosbard. I will warn both of you again, we don't need any editorializing, Mr. Grosbard."

This record shows that the defense attorneys complained about Grosbard, as they often did. But it does not establish misconduct. The trial judge, who was present and could observe the proceedings, did not believe more than these simple admonitions was needed. We have no basis on which to disagree or to find any prejudicial misconduct.

(e) Defendant contends Speer committed misconduct in cross-examining Arturo Talamante, the coordinator of ministry in prisons who testified about defendant's professed religious conversion. On direct examination, Talamante testified that "in these past 25 years, I've only found two people who have the spirituality that he [defendant] has had." On cross-examination, over objection, the prosecutor asked the witness who the second person was. Talamante said it was Mr. Bedolla Duarte. He also testified that Bedolla Duarte "was equally as spiritual as the defendant." Speer then asked, "And do you believe that someone like Mr. [Duarte] or Mr. Sanchez in court, if they really found God they would not go out and commit vicious acts of murder?" Defendant objected on the grounds of "improper future dangerousness." Speer responded that she was "testing his opinion." The court overruled the objection. The witness said he believed that "people that have truly found God don't go out and commit vicious acts of murder." He believed this of both defendant and Bedolla.

Over objection, the court ruled that, because the witness had said that in "his 25 years there's only been two people of the level of spirituality he has ever experienced, Bedolla being one and the defendant being the other," the prosecutor could question him about crimes Bedolla had committed after supposedly finding God "to impeach his assessment of sincerity." It added

that the prosecutor could not go into future dangerousness. It explained that "when we have a very strong statement by this witness saying these are the only two people in 25 years, I think she certainly has a right to explore that." The prosecutor then noted to the witness that Bedolla had recently been convicted of three counts of first degree murder, five counts of attempted murder, 10 counts of robbery, and 12 counts of assault with a firearm. The witness said he did not know that but reiterated his belief that Bedolla had found God.

Defendant contends the court should not have permitted this cross-examination. He does not contend the prosecutor lacked a good faith belief in the facts of Bedolla's convictions (see *People v. Payton* (1992) 3 Cal.4th 1050, 1066 [13 Cal.Rptr.2d 526, 839 P.2d 1035]), but he argues it was improper impeachment. We disagree. As the trial court noted in overruling defendant's objection, the witness identified defendant and Bedolla as the two people who were the most spiritual in his 25 years of experience. The prosecutor was entitled to explore the credibility of this belief. (*Id.* at pp. 1066–1067 [cross-examination of a religious-conversion witness].) "The value of giving the jury a full and accurate view of [Talamante's] credibility was not substantially outweighed by the probability of a substantial danger of undue prejudice. (Evid. Code, § 352.)" (*People v. Bennett, supra*, 45 Cal.4th at p. 607.) We see no abuse of discretion.

(f) Defendant contends Speer committed many acts of misconduct in the jury argument. She argued that the murders were particularly aggravated because they were deliberate and premeditated. The court overruled defendant's objection that the argument was "beyond the scope of the instructions" and later overruled his renewed objection. Noting that the prosecution had successfully objected to guilt phase instructions on deliberation and premeditation and instead relied solely on the felony-murder rule as a basis for first degree murder, defendant contends it was misconduct to argue premeditation and deliberation at the penalty phase. But the two phases are quite different. The jury was entitled to consider the "circumstances of the crime" in its penalty determination. (Pen. Code, § 190.3, factor (a).) Whether the murders were deliberate and premeditated was a circumstance of the crime relevant to penalty even if the question was irrelevant as to guilt due to the felony-murder rule. Defendant also claims the prosecutor misstated the law in this regard by arguing that "premeditation and deliberation is certainly more aggravating than an unintentional killing or accidental killing during the course of a robbery." She did not misstate the law. She merely argued circumstances that, in her view, made the crimes particularly aggravated. Doing so was proper.

In her opening statement to the jury at the outset of the penalty phase, Speer explained the penalty phase process. Without objection, she said the

new phase would "venture into the background and character of the defendants. Now, we cannot tell you everything about the defendants in this phase of the trial. We are limited by law as the judge was explaining to you briefly to factors which are called factors in aggravation, (a), (b), and (c), which are part of the jury instructions that you will receive at the end of the evidence. The remaining factors that are listed in these two charts in front of you can only be in mitigation, they cannot be aggravation, except for the question of (a), which can be mitigation or aggravation, which we will explain later on during the trial."

In her argument to the jury after presentation of evidence, she said, "We chose, Mr. Grosbard and I, to rely on the weight and gravity and the convincing force of the evidence that you heard during the guilt phase." None of the defendants objected at the time. Later, outside the jury's presence, defendant's attorney objected that this "argument implied that there's things that the prosecution could have used but didn't use, and that's not the state of the case." The court noted that counsel did not object "at the time where I could have corrected it." It added that "there was something I caught that could have been inferred that way, and then as she went on I thought the inference was not supported." It requested defense counsel to find the statement objected to in the transcript. As far as the record shows, counsel did not pursue the matter.

Defendant contends the prosecutors improperly implied to the jury that other aggravating evidence existed they chose not to present. The matter is not cognizable because defendant never objected to the opening statement and did not timely object to the argument on this ground. Further, counsel did not request an admonition after the court invited him to find the statement in the record. As the trial court indicated, an admonition could easily have corrected any misimpression. It appears counsel decided to drop the matter, which was reasonable under the circumstances. Any improper implication was very weak and was never exploited. Other parts of the prosecutor's argument and the court's instructions made clear to the jury that its verdict had to be based on the evidence presented at the guilt and penalty phases of the trial. The vague statement complained of, made in the course of a very lengthy argument, could not have influenced the outcome.

Speer argued to the jury that the defense attorneys would ask for mercy for their clients, but that the prosecution asked instead for justice. She noted that crime victims are not permitted themselves to seek vengeance for the crimes—that was what the criminal justice system is for. She went on to argue, "we owe the victims in this case vengeance as part of our system of justice and as sanctioned by the laws of our state, and that you swore to uphold as jurors in this case in determining the penalty." The court overruled

defendant's objection at the time. Later, outside the jury's presence, it overruled defendant's renewed objection, but it also instructed the prosecutor "to stay away from any further discussion of vengeance."

 Defendant contends this discussion of vengeance was improper. It was not. "[P]rosecutorial references to community vengeance, while potentially inflammatory, are not misconduct if they are brief and isolated, and do not form the principal basis for advocating the death penalty." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1178 [63 Cal.Rptr.3d 297, 163 P.3d 4].) "We noted in *Zambrano* that it is not error to argue 'that the death penalty, where imposed in deserving cases, is a valid form of community retribution or vengeance—i.e., punishment—exacted by the state, under controlled circumstances, and on behalf of all its members, in lieu of the right of personal retaliation.' ([*Zambrano*], at p. 1178.) As in *Zambrano*, the prosecutor's comments 'did not seek to invoke untethered passions, or to dissuade jurors from making individual decisions, but only to assert that the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes.' (*Id.* at p. 1179.) No misconduct occurred." (*People v. Collins* (2010) 49 Cal.4th 175, 228 [110 Cal.Rptr.3d 384, 232 P.3d 32].) Arguing that "we owe the victims in this case vengeance as part of our system of justice" did not violate this rule. The comment was brief and isolated. Indeed, the court, in overruling defendant's objection, ordered the prosecutor to stay away from further discussion of vengeance, which the prosecutor did.

Speer argued that "the defense may argue that we are stooping to their level by giving the death penalty for killers, but there is a big difference, and that couldn't be further from the truth, for the defendants will be executed, they will be entitled to all the rights, privileges and safeguards that our society could possibly provide, and that were meticulously honored by the police, the courts, the attorneys, Mr. Grosbard and myself." The court overruled defendant's objection to the argument. Defendant contends this argument violated the rule "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 328–329 [86 L.Ed.2d 231, 105 S.Ct. 2633].) It did not do so. The prosecutor merely compared a death sentence that would be rendered after all of the procedural protections defendants received with the murders they committed. Nothing in these comments suggested the responsibility for determining the proper penalty rested elsewhere.

Finally, defendant cites a host of additional comments that he collectively characterizes as "flagrant misconduct." Some were made at the guilt phase,

but defendant claims they improperly influenced the penalty determination. We have reviewed these comments and find little, if anything, that is at all problematic and certainly nothing prejudicial. Contrary to defendant's argument, one portion of the argument did not improperly argue deterrence. At another point, the prosecutor argued that defendants "may say that execution is horrible, but any means of execution in our state is done with great efforts and great attempts to make it as humane as possible." The court sustained defendant's objection and admonished the jury that it was "not to consider for any purpose the manner of execution. That is not something that needs to be or should be considered by you in your determination as to which penalty is appropriate." The comment could not have affected the outcome, especially in light of the admonition. Contrary to defendant's argument, comparing the robberies to a "military operation," describing some of the actions as "torture" or coming "into the Outrigger like stormtroopers," and calling defendant a "little man," were all properly based on the evidence. (See *People v. Dykes* (2009) 46 Cal.4th 731, 768 [95 Cal.Rptr.3d 78, 209 P.3d 1].) The robberies *were* arguably like a military operation, the evidence showed defendant did torture two victims, the reference to "stormtroopers" did not improperly refer to any particular historical figures (cf. *People v. Bloom* (1989) 48 Cal.3d 1194, 1213 [259 Cal.Rptr. 669, 774 P.2d 698]), and we have permitted far worse epithets than "little man" (which the prosecutor presumably meant figuratively more than literally) when the evidence warranted it. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 691–692 [137 Cal.Rptr.3d 147, 269 P.3d 568].)

### 7. *Denial of Instruction Regarding Mercy*

The court denied defendants' request to instruct the jury regarding mercy. Defendant contends the court erred. It did not. The standard instructions the court gave were sufficient to inform the jury of its sentencing responsibility, and no specific instruction on mercy was required. (*People v. Jones* (2012) 54 Cal.4th 1, 74–75 [140 Cal.Rptr.3d 383, 275 P.3d 496], and cases cited.)

### 8. *Denial of Motion to Modify Verdict*

█ Defendant contends the court erred in denying his automatic motion to modify the verdict of death. (Pen. Code, § 190.4.) "In ruling on defendant's application for modification of the verdict, the trial court must reweigh the evidence; consider the aggravating and mitigating circumstances; and determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. [Citation.] On appeal, although the trial court's ruling is subject to independent review, we do not make a de novo determination of penalty." (*People v. Brady* (2010) 50 Cal.4th 547, 588 [113 Cal.Rptr.3d 458, 236 P.3d 312].) We have reviewed the court's ruling and

conclude it applied the correct standard. It understood its role perfectly and reviewed the evidence and law thoroughly.

Defendant contends the court erred in several respects. "Because [he] failed to object on these—or any—grounds, and because the modification hearing postdated our decision in *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984], [he] has forfeited these claims." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 650 [168 Cal.Rptr.3d 380, 319 P.3d 151].) We would also reject the contention on the merits.

As defendant notes, the court did make one mistake in its extraordinarily detailed recitation of the facts of the crimes. The court stated that defendant "personally . . . sexually assaulted" Maricella Mendoza. In fact, although she testified that one of the robbers had tried to kiss her, it appears defendant was not that person. But the mistake was insignificant in light of the crimes as a whole. The court found that the jury's assessment "that the factors in aggravation substantially outweighed the factors in mitigation and that death is warranted is overwhelmingly supported by the evidence." We see no reasonable possibility the misstatement affected the ruling. (*People v. Cleveland* (2004) 32 Cal.4th 704, 767 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

The court also stated that defendant "tortured" Armando Lopez and Maricella Mendoza. Defendant contends the court erred in using this word because he was not charged with the crime of torture under Penal Code section 206. But the court did not state that defendant had been convicted of the crime of torture. Rather, it stated that he did, in fact, torture the two. The evidence showed that he did exactly that when he repeatedly used the stun gun on them while trying to force Lopez to unlock the safe. Indeed, witnesses said their screams of pain could be heard throughout the restaurant.

 The court found that the evidence of defendant's "upbringing and religious conversion does not serve as a moral justification or extenuation for his conduct *and further finds that such mitigation is not sufficient to serve as a basis for a sentence less than death.*" (Italics added.) Defendant argues the court erred because he did not have to show "that his mitigating evidence served as a moral justification for his conduct." He is correct, but the court never suggested he did have to make that showing. Whether the "the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct" is a statutorily designated factor in mitigation for the sentencer to consider. (Pen. Code, § 190.3, factor (f).) The court properly noted the absence of this factor in mitigation. It repeatedly stated it was considering *all* of the evidence and *all* of the factors in mitigation, and it did so, thoroughly. The italicized portion of the court's ruling that defendant challenges made clear the court did consider

the evidence in mitigation for all purposes. "The court must *consider* all of the evidence, but it need not give any particular weight or, indeed, *any* weight to any particular evidence offered in mitigation." (*People v. Rodriguez, supra,* 58 Cal.4th at p. 651.)

The court mentioned that it had received a letter from defendant and briefly described its contents. It said the letter was delivered after the trial "and has no impact on the court's evaluation of the motion under [Penal Code section] 190.4, but to have an impact to find that the conversion is sincere, the court is not able to make that finding." Defendant argues this means the court improperly considered the letter rather than limiting itself to the evidence presented at trial. He is correct that the court is supposed to consider only the evidence presented at trial. (*People v. Rodriguez, supra,* 58 Cal.4th at p. 651.) The court recognized that rule. It is not entirely clear what the court otherwise meant, but at most it added that the letter did not cause it to find the claimed religious conversion was sincere. What is clear is that the court did not base its denial of the modification motion on the letter.

The court properly denied the modification motion.

### 9. Challenges to California's Death Penalty Law

Defendant reiterates several contentions we have repeatedly rejected. We see no reason to reconsider our previous decisions.

Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious. (*People v. Johnson* (2015) 60 Cal.4th 966, 997 [184 Cal.Rptr.3d 612, 343 P.3d 808].) "Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*Ibid.*) "CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid." (*People v. Rountree, supra,* 56 Cal.4th at pp. 862–863.) "The trial court was not required to instruct the jury that there is no burden of proof at the penalty phase, and that the beyond-a-reasonable-doubt standard and requirement of jury unanimity do not apply to mitigating factors." (*People v. Streeter* (2012) 54 Cal.4th 205, 268 [142 Cal.Rptr.3d 481, 278 P.3d 754]; see also *Kansas v. Carr, supra,* 577 U.S. at p. ___ [136 S.Ct. at pp. 641–644].) Penal Code "[s]ection 190.3's use of adjectives such as 'extreme' and 'substantial' in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating

factors." (*Rountree*, at p. 863.) "The court need not delete inapplicable sentencing factors or instruct that statutory mitigating factors are relevant solely in mitigation." (*Ibid.*) Intercase proportionality review is not required. (*Id.* at p. 862.)[11] California's death penalty law does not violate equal protection by treating capital and noncapital defendants differently. (*Rountree*, at p. 863.) California's use of the death penalty does not violate international law. (*Ibid.*)

### D. Cumulative Prejudice

Defendant contends the cumulative effect of the claimed errors was prejudicial. We are reversing one count of robbery. But this error is not prejudicial regarding the death judgment given that defendant committed numerous other crimes including two murders, one attempted murder, and 25 other robberies. Any other assumed error, even considered cumulatively, was not prejudicial.

### III. CONCLUSION

We reverse defendant's conviction and sentence on count 21, the robbery of Arturo Flores, modify the determinate prison sentence to a sentence of 53 years six months, and otherwise affirm the judgment.

Cantil-Sakauye, C. J., Werdegar, J., Corrigan, J., Cuéllar, J., and Kruger, J., concurred.

**LIU J., Concurring.**—I write separately to highlight two issues in this case that are ripe for reconsideration by this court. The first concerns the relevance of comparative juror analysis in determining whether a defendant has established a prima facie case of racial discrimination in jury selection under *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). The second concerns California's standard instruction on how juries should evaluate eyewitness identification evidence, a topic on which scientific research has shed important light in recent decades.

### I.

Today's opinion holds that the trial court did not err when it found no prima facie case of racial discrimination in the prosecutor's use of peremptory strikes against several Hispanic jurors. (Maj. opn., *ante*, at pp. 433–440.)

---

[11] We do provide intracase proportionality review on request. (*People v. Rountree, supra*, 56 Cal.4th at p. 860.) Defendant does not request it, but, even if he did, such review would not aid him. Given the extraordinarily callous and brutal nature of the crimes, defendant's death sentence is neither disproportionate to his individual culpability nor shocking to the conscience. (*Ibid.*)

In reaching this conclusion, the court posits various nondiscriminatory reasons for why the prosecutor would have wanted to strike those jurors. (*Id.* at pp. 436–437, 439.) I agree that those reasons are apparent and clearly established in the record. However, the court goes on to say: "Defendant asks us to engage in comparative juror analysis, but such analysis is inappropriate in a first stage case such as this, where we do not evaluate the prosecution's stated reasons for the challenges." (*Id.* at p. 439.)

I have previously explained why our rule barring comparative juror analysis at the first stage of the *Batson* inquiry violates *Batson*'s directive to consider "all relevant circumstances" in determining whether the opponent of a strike has established a prima facie case of discrimination. (*Batson, supra,* 476 U.S. at p. 96; accord, *Johnson v. California* (2005) 545 U.S. 162, 168–169 [162 L.Ed.2d 129, 125 S.Ct. 2410].) "If a court hypothesizes race-neutral reasons the prosecution might have given for striking a particular juror, isn't it relevant to inquire whether those reasons applied equally to other jurors?" (*People v. Harris* (2013) 57 Cal.4th 804, 875 [161 Cal.Rptr.3d 364, 306 P.3d 1195] (conc. opn. of Liu, J.) (*Harris*).) "As the high court has explained: 'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.' (*Miller-El* [*v. Dretke* (2005) 545 U.S. 231,] 241 [162 L.Ed.2d 196, 125 S.Ct. 2317].) By the same logic, if a court's hypothesized reason for a prosecutor's strike of a black panelist 'applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered' at *Batson*'s first step." (*Id.* at p. 874 (conc. opn. of Liu, J.)

Today's opinion cites *People v. Taylor* (2010) 48 Cal.4th 574, 616–617 [108 Cal.Rptr.3d 87, 229 P.3d 12] (*Taylor*) for the contrary rule. That case quoted *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [60 Cal.Rptr.3d 209, 160 P.3d 84] (*Bonilla*), which in turn cited *People v. Bell* (2007) 40 Cal.4th 582, 601 [54 Cal.Rptr.3d 453, 151 P.3d 292] (*Bell*).

In *Bell,* "[t]his court, like the trial court, [was] able to determine that defendant made no prima facie case without hypothesizing permissible reasons that might have motivated the prosecutor's challenges." (*Bell, supra,* 40 Cal.4th at p. 600.) The defendant argued that the high court's then-recent decision in *Miller-El* mandated comparative juror analysis at *Batson*'s first step. Rejecting this argument, we said: "In the circumstances of this first-stage *Wheeler-Batson* case, comparative juror analysis would make little sense. In determining whether defendant has made a prima facie case, the trial court did not ask the prosecutor to give reasons for his challenges, the prosecutor did not volunteer any, and the court did not hypothesize any. Nor,

obviously, did the trial court compare the challenged and accepted jurors to determine the plausibility of any asserted or hypothesized reasons. Where, as here, no reasons for the prosecutor's challenges were accepted or posited by either the trial court or this court, there is no fit subject for comparison. Comparative juror analysis would be formless and unbounded." (*Bell*, at pp. 600–601.) We added: "*Miller-El* does not mandate comparative juror analysis in a first-stage *Wheeler-Batson* case when neither the trial court nor the reviewing courts have been presented with the prosecutor's reasons or have hypothesized any possible reasons." (*Id.* at p. 601.) *Bell* thus stands for the proposition that comparative juror analysis does not make sense at *Batson*'s first step when neither the trial court nor a reviewing court has hypothesized any reasons for the contested strike. In that circumstance, "there is no fit subject for comparison," and a court has no duty to compare jurors on the basis of "unspecified criteria." (*Bell*, at p. 601.)

Four months later, this court in *Bonilla* extended the rule against comparative juror analysis at *Batson*'s first step to circumstances where we did hypothesize reasons for the contested strikes. (See *Bonilla, supra,* 41 Cal.4th at pp. 343, 346–349 [positing reasons to explain multiple strikes].) The entirety of our reasoning was that "this is a 'first-stage' *Wheeler/Batson* case, in that the trial court denied Bonilla's motions after concluding he had failed to make out a prima facie case, not a 'third-stage' case, in which a trial court concludes a prima facie case has been made, solicits an explanation of the peremptory challenges from the prosecutor, and only then determines whether the defendant has carried his burden of demonstrating group bias. We have concluded that *Miller-El v. Dretke*[, *supra,*] 545 U.S. 231 . . . does not mandate comparative juror analysis in these circumstances (*People v. Bell, supra,* 40 Cal.4th at p. 601), and thus we are not compelled to conduct a comparative analysis here. Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis here." (*Bonilla, supra,* 41 Cal.4th at p. 350.)

*Bonilla*'s reliance on *Bell* was misplaced. *Bell* held that comparative juror analysis is not required when a reviewing court *does not* hypothesize reasons for a contested strike in finding no prima facie case of discrimination. (*Bell, supra,* 40 Cal.4th at pp. 600–601.) *Bell*'s reasoning does not apply when a reviewing court *does* hypothesize such reasons, for in that circumstance, there *is* a "fit subject for comparison," and the criteria for comparing jurors are not "unspecified." (*Id.* at p. 601.) If a court posits a nondiscriminatory reason for a contested strike, whether that reason applies to similarly situated jurors

whom the prosecutor did not strike is plainly a "relevant circumstance[]" bearing on its plausibility as an explanation for the contested strike. (*Batson, supra*, 476 U.S. at p. 96.)

Since *Bonilla*, this court has repeatedly held that it is unnecessary to engage in comparative juror analysis to test the plausibility of a hypothesized reason at *Batson*'s first step. (See *People v. Streeter* (2012) 54 Cal.4th 205, 225–226 & fn. 5 [142 Cal.Rptr.3d 481, 278 P.3d 754] (*Streeter*); *People v. Clark* (2011) 52 Cal.4th 856, 907–908 & fn. 13 [131 Cal.Rptr.3d 225, 261 P.3d 243] (*Clark*); *Taylor, supra*, 48 Cal.4th at pp. 616–617; *People v. Hawthorne* (2009) 46 Cal.4th 67, 80, fn. 3 [92 Cal.Rptr.3d 330, 205 P.3d 245]; *People v. Howard* (2008) 42 Cal.4th 1000, 1019–1020 [71 Cal.Rptr.3d 264, 175 P.3d 13].) Our cases have simply cited *Bonilla* or precedent applying *Bonilla* without further reasoning.

Recently, in *Harris*, one justice changed her view on this issue: "When, as here, a reviewing court discerns from the record that a peremptory challenge is supported by a race-neutral reason not stated by the prosecutor, should the court also consider whether that reason 'applied equally to other jurors' not challenged by the prosecutor? (Conc. opn. of Liu, J., *post*, [57 Cal.4th] at p. 875.) As Justice Liu explains, consideration of such information flows logically from the United States Supreme Court's statement that, in determining whether a party has made a prima facie case that the opposing party has challenged a prospective juror because of race, a court should consider 'all relevant circumstances.' (*Batson, supra*, 476 U.S. at pp. 96–97.) But in that situation, this court has noted in past decisions that it would not engage in comparative juror analysis. [Citations to *Streeter*, *Clark*, and *Bonilla*.] I joined those decisions. I am now persuaded, however, that circumstances pertaining to other jurors can be relevant in this context. What comes to mind in this change of view are the oft-quoted words of United States Supreme Court Justice Felix Frankfurter: 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' (*Henslee v. Union Planters Bank* (1949) 335 U.S. 595, 600 [93 L.Ed. 259, 69 S.Ct. 290] (dis. opn. of Frankfurter, J.).)" (*Harris, supra*, 57 Cal.4th at pp. 862–863 (conc. opn. of Kennard, J.).)

Notably, this court in *Harris*, while observing that "we have declined to conduct a comparative juror analysis" at *Batson*'s first step, acknowledged contrary precedent and did not reaffirm our rule. (*Harris, supra*, 57 Cal.4th at p. 836, citing *U.S. v. Collins* (9th Cir. 2009) 551 F.3d 914.) Instead of finding it unnecessary to conduct a comparative juror analysis, *Harris* held that "even if we were to do so, a comparative juror analysis does not aid defendant." (*Harris*, at p. 836.) The court proceeded to conduct a comparative juror analysis (*id.* at pp. 836–838)—as did Justice Kennard (*id.* at p. 863 (conc.

opn. of Kennard, J.)) and I (*id.* at pp. 876–879 (conc. opn. of Liu, J.))—and the court concluded that there were valid reasons in the record for distinguishing between the contested jurors and other prospective jurors. The reasoning of all seven justices in *Harris* belies any concern that comparative juror analysis in these circumstances would be "formless and unbounded" (*Bell, supra,* 40 Cal.4th at p. 601) or analytically of "little or no use" (*Bonilla, supra,* 41 Cal.4th at p. 350) or otherwise "inappropriate" (maj. opn., *ante,* at p. 439). (Cf. *Harris,* at p. 876 (conc. opn. of Liu, J.) [noting that the court in *Harris* engaged in comparative juror analysis at step one of *Batson* "for the first time in our case law," and questioning whether "the court in deed, if not in word, has signaled a retreat from its established rule"].)

Our decisions, including this one, have never cited any other jurisdiction that has rejected the relevance of comparative juror analysis in testing a hypothesized reason for a contested strike. Meanwhile, a mountain of contrary authority has piled up before and after *Bonilla.* (See, e.g., *Sanchez v. Roden* (1st Cir. 2014) 753 F.3d 279, 302 [" '[A] prima facie case of discrimination can be made out by offering a wide variety of evidence.' [Citation.] . . . [¶] . . . [O]f great importance here, we take into account 'whether similarly situated jurors from outside the allegedly targeted group were permitted to serve' on the jury in ruling on a *Batson* challenge."]; *Aspen v. Bissonnette* (1st Cir. 2007) 480 F.3d 571, 577 ["In considering [whether a defendant has raised an inference of discrimination], courts examine both numeric and non-numeric forms of evidence. . . . Relevant non-numeric evidence includes . . . apparent non-discriminatory reasons for striking potential jurors based on their voir dire answers, [citation], and whether similarly situated jurors from outside the allegedly targeted group were permitted to serve . . . ."]; *Bennett v. Gaetz* (7th Cir. 2010) 592 F.3d 786, 792 ["[U]nder the facts of this case, the jurors' experience with crime seems an implausible reason for the peremptories. Although the two African-Americans struck by the prosecution testified that they had been crime victims, so too did at least four non-African-Americans who ultimately served as jurors. Based on this side-by-side comparison between excluded and non-excluded jurors, the prosecution would have been hard-pressed to credibly assert the jurors' experience with crime as a race-neutral reason had the trial court proceeded to *Batson*'s second stage."]; *U.S. v. Young-Bey* (8th Cir. 1990) 893 F.2d 178, 180 [evidence supporting an inference of discrimination under *Batson* includes "a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, [and] the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons"]; *U.S. v. Johnson* (8th Cir. 1989) 873 F.2d 1137, 1140 ["In this case, the voir dire record does raise the inference of discrimination as the Government struck black veniremen at a disproportionate rate and struck blacks who did not respond during voir dire

but did not strike whites who similarly did not respond."]; *U.S. v. Hughes* (8th Cir. 1989) 880 F.2d 101, 103 ["There were six blacks on the original jury panel. . . . During voir dire one of these three jurors . . . did not answer affirmatively to any of the district court's questions calculated to determine bias or prejudice. Yet, as we read the voir dire, others did not answer and some of those who did not answer appear to have served on the petit jury. [¶] A second of the blacks challenged . . . had served as a juror in city court and had been a victim of a burglary eight years earlier. . . . About half of the venire similarly had been crime victims and several had prior jury service."]; *Crittenden v. Ayers* (9th Cir. 2010) 624 F.3d 943, 956 ["[C]omparative juror analysis may be employed at step one to determine whether the petitioner has established a prima facie case of discrimination."]; *U.S. v. Collins, supra,* 551 F.3d at p. 922 ["[B]ased on our review of the record, we conclude that an inference of discrimination did exist in this case. Comparison of Juror No. 9's characteristics with the characteristics of other similarly situated panel members who were allowed to serve reveals little distinction that could account for the prosecutor's strike of Juror No. 9."]; *U.S. v. Esparsen* (10th Cir. 1991) 930 F.2d 1461, 1467 ["By itself, the number of challenges used against members of a particular race is 'not sufficient to establish or negate a prima facie case.' [Citations.] The number takes on meaning only in the context of other information such as the racial composition of the venire, the race of others struck by the prosecution, or the voir dire answers of those who were struck compared to the answers of those who were not struck." (fns. omitted)]; *U.S. v. Ochoa-Vasquez* (11th Cir. 2005) 428 F.3d 1015, 1044 ["In order to determine whether a *Batson* objector like Ochoa has established a prima facie case of discrimination, courts must consider all relevant circumstances. [Citations.] . . . While statistical evidence may support an inference of discrimination, it can do so 'only' when placed 'in context.' [Citations.] For example, 'the number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck.' "]; *U.S. v. Allison* (11th Cir. 1990) 908 F.2d 1531, 1538 ["In making out a prima facie case, . . . '[t]he defendant must identify facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons.' "]; *State v. Rhone* (2010) 168 Wn.2d 645 [229 P.3d 752, 757] ["circumstances evincing an inference of discrimination" include "similarities between those individuals who remain on the jury and those who have been struck"]; *People v. Davis* (2009) 233 Ill.2d 244 [330 Ill.Dec. 744, 909 N.E.2d 766, 773] [comparative juror analysis is "one factor in the totality of the circumstances that the court should take into consideration in considering the existence of a *prima facie*

case"]; *People v. Bolling* (1992) 79 N.Y.2d 317 [582 N.Y.S.2d 950, 591 N.E.2d 1136, 1141] ["The defendant may also raise an inference of discrimination by making a record comparing Caucasians accepted with similarly situated African-Americans challenged . . . ."]; *Ex parte Branch* (Ala. 1987) 526 So.2d 609, 622–623 ["the types of evidence that can be used to raise the inference of discrimination" include "[d]isparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., . . . a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged"].)

In sum, the rule we announced in *Bonilla* is out of step with prevailing authority; *Bonilla*'s reliance on *Bell* was misplaced; neither *Bonilla* nor any subsequent case has explained why comparative juror analysis is irrelevant or inappropriate to test the plausibility of a hypothesized reason for a contested strike; and the application of comparative juror analysis by the majority and concurring justices in *Harris* demonstrates its relevance to the first-stage *Batson* inquiry. These considerations present ample justification for reconsidering our precedent. (See *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296–297 [250 Cal.Rptr. 116, 758 P.2d 58].)

In this case, the court's first-stage analysis includes hypothesized reasons for the prosecutor's strikes of Prospective Jurors P.G., E.A., and T.M. (Maj. opn., *ante*, at pp. 436–437, 439.) Comparative juror analysis is warranted but, on this record, does not aid the *Batson* claims. Although defendant Edgardo Sánchez says four other jurors were similar to P.G. in their opposition to the death penalty, the record shows that none of the four expressed as strong a dislike of the death penalty as P.G. did. As to E.A., Sánchez does not identify any comparison jurors, and in any event, no other prospective juror possessed E.A.'s combination of reluctance to be involved in making a death penalty decision, history of sexual abuse as a child, and recent experience of a brain operation for a seizure disorder. And as to T.M., the record shows that there were 10 other jurors who answered "yes" on the questionnaire to the question whether the juror had "moral, ethical or religious beliefs that would make it difficult for you to vote for" the death penalty. Among those 10, six were excused for cause, two were struck by the prosecution, and the other two never reached the jury box. Comparative juror analysis thus casts no doubt on the plausibility of the reasons posited by the court for the strikes of P.G., E.A., and T.M., and I join the court in affirming the trial court's first-stage *Batson* rulings.

## II.

The trial court instructed the jury with CALJIC No. 2.92, which says that "[i]n determining the weight to be given eyewitness identification testimony,

you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including but not limited, to any of the following: [¶] . . . [¶] The extent to which the witness is either certain or uncertain of the identification . . . ." Sánchez argues that the trial court erred in instructing the jury that it could consider the certainty factor. I agree that Sánchez forfeited this claim (maj. opn., *ante*, at p. 461) and that any error was harmless because "the eyewitness identifications were far from the only evidence connecting defendant to the crimes" (*id.* at p. 462). But I do not join the court in approving the instruction as given in this case.

Today's opinion notes that during the more than two decades since we approved the certainty factor in *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232 [14 Cal.Rptr.2d 702, 842 P.2d 1], at least two state high courts have disapproved instructing on this factor in light of scientific studies showing that witness certainty is not necessarily correlated with accuracy of eyewitness identifications. (See *State v. Mitchell* (2012) 294 Kan. 469 [275 P.3d 905, 912–913] (*Mitchell*); *Commonwealth v. Santoli* (1997) 424 Mass. 837 [680 N.E.2d 1116, 1121].) The court goes on to say that this case involves "uncertain as well as certain identifications" and that "[a]ny reexamination of our previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications." (Maj. opn., *ante*, at p. 462.)

But even if it were proper to instruct the jury to consider a witness's expression of *uncertainty* regarding an identification, that would not mean it is proper to instruct the jury to consider a witness's expression of *certainty*. They are not two sides of the same coin. If it is erroneous to instruct a jury to consider a witness's certainty in evaluating the accuracy of an identification, then it is no less erroneous to instruct a jury to consider both certainty and uncertainty in a case involving certain and uncertain identifications. Because we can dispose of Sánchez's claim on grounds of forfeiture and harmless error, we need not resolve the merits here. But I see no reason to "await a case involving only certain identifications" (maj. opn., *ante*, at p. 462) before taking up this important issue.

The court says "[t]he instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy." (Maj. opn., *ante*, at p. 462.) But the instruction naturally "prompts the jury to conclude that an eyewitness identification is more reliable when the witness expresses greater certainty." (*Mitchell, supra*, 275 P.3d at p. 913.) As the New Jersey Supreme Court explained in a recent decision reevaluating the legal framework for admitting eyewitness identification evidence, "[w]e presume that jurors are able to detect liars from truth

tellers. But as scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and '[b]ecause the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness.' [Citation.] Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications." (*State v. Henderson* (2011) 208 N.J. 208 [27 A.3d 872, 889] (*Henderson*).)

The Oregon Supreme Court, in another recent decision reexamining the admissibility of eyewitness identification evidence, summarized the research on witness certainty and accuracy as follows: "Despite widespread reliance by judges and juries on the certainty of an eyewitness's identification, studies show that, under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy. Regarding *prospective* certainty— the witness's confidence *prior to* the identification procedure in his or her ability to make an identification—a number of meta-analytic studies have found no correlation between certainty and identification accuracy. In contrast, *retrospective* certainty—witness confidence in the accuracy of their identification *after* it has occurred—may have a weak correlation with accuracy. See Gary L. Wells & Elizabeth A. Olsen, *Eyewitness Testimony*, 54 Ann. Rev. Psychol. 277, 283 (2003) (describing studies). The effect, however, appears only within the small percentage of extremely confident witnesses who rated their certainty at 90 percent or higher, and even those individuals were wrong 10 percent of the time. *Id.*

"Research also shows that retrospective self-reports on eyewitness certainty are highly susceptible to suggestive procedures and confirming feedback, a factor that further limits the utility of the certainty variable. Wells, '*Good, You Identified the Suspect*'[*: Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience* (1998)] 83 J. Applied Psychol. 360. Witnesses who receive confirming feedback—*i.e.*, are told or otherwise made aware that they made a correct identification—report higher levels of retrospective confidence than witnesses who receive either no feedback or disconfirming feedback. *Id.* It appears, moreover, that confirming feedback may inflate confidence to a greater degree in mistaken identifications than in correct identifications. *See, e.g.*, Amy L. Bradfield *et al.*, *The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy*, 87 J. Applied Psychol. 112, 115 (2002) (reporting that inaccurate witness self-reports increased from an average of 49 percent certain to an average of 67 percent certain after receiving confirming feedback, while the same feedback increased accurate witnesses' certainty only from an average of 80 percent to 85 percent).

"Finally, we note that witness certainty, although a poor indicator of identification accuracy in most cases, nevertheless has substantial potential to

influence jurors. Studies show that eyewitness confidence is the single most influential factor in juror determinations regarding the accuracy of an eyewitness identification. *See, e.g.,* Gary L. Wells *et al., Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification,* 64 J. Applied Psychol. 440, 446 (1979); Michael R. Leippe *et al., Cueing Confidence in Eyewitness Identifications: Influence of Biased Lineup Instructions and Pre-Identification Memory Feedback Under Varying Lineup Conditions,* 33 Law & Hum. Behav. 194, 194 (2009) (summarizing prior research). Jurors, however, tend to be unaware of the generally weak relationship between confidence and accuracy, and are also unaware of how susceptible witness certainty is to manipulation by suggestive procedures or confirming feedback. *See, e.g.,* Tanja R. Benton *et al., Eyewitness Memory is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts,* 20 Applied Cognitive Psychol. 115, 120 (2006) (finding that only 38 percent of jurors surveyed correctly understood the relationship between accuracy and confidence and only 50 percent of jurors recognized that witnesses' confidence can be manipulated). As a result, jurors consistently tend to overvalue the effect of the certainty variable in determining the accuracy of eyewitness identifications." (*State v. Lawson* (2012) 352 Or. 724 [291 P.3d 673, 704–705]; see *State v. Ledbetter* (2005) 275 Conn. 534 [881 A.2d 290, 311–313] [reviewing research showing that "a weak correlation, at most, exists between the level of certainty demonstrated by the witness at the identification and the accuracy of that identification" and that "this factor seems to have a significant impact on the [jury's] reliability analysis"].)

In a recent report canvassing the scientific research on eyewitness identification, a committee of the National Academy of Sciences wrote: "Evidence indicates that self-reported confidence at the time of trial is not a reliable predictor of eyewitness accuracy. The relationship between the witness' stated confidence and accuracy of identifications may be greater at the moment of initial identification than at the time of trial. However, the strength of the confidence-accuracy relationship varies, as it depends on complex interactions among such factors as environmental conditions, persons involved, individual emotional states, and more. Expressions of confidence in the courtroom often deviate substantially from a witness' initial confidence judgment, and confidence levels reported long after the initial identification can be inflated by factors other than the memory of the suspect." (Nat. Research Council, Identifying the Culprit: Assessing Eyewitness Identification (2014) p. 108, fns. omitted (Identifying the Culprit).)

CALJIC No. 2.92 instructs the jury that the "extent to which the witness is either certain or uncertain of the identification" is a factor "bear[ing] upon the

accuracy of the witness identification of the defendant" that "you should consider." This instruction does not distinguish between witness certainty at the time of identification and witness certainty at the time of trial. Nor does it caution that many factors can affect the relationship between certainty and accuracy at the time of identification and at the time of trial. Nor does it acknowledge that the relationship between uncertainty and inaccuracy may differ from the relationship between certainty and accuracy. To be sure, the reliability of eyewitness identification is a matter that the parties can contest at trial, using expert testimony if they wish. (See *People v. McDonald* (1984) 37 Cal.3d 351, 369 [208 Cal.Rptr. 236, 690 P.2d 709]; *Perry v. New Hampshire* (2012) 565 U.S. 228, 244–248 [181 L.Ed.2d 694, 132 S.Ct. 716, 728–730].) But the parties' evidence and arguments do not obviate the need for a proper jury instruction. In light of developments in scientific research and recent case law, there is a substantial question whether it is proper for trial courts to instruct that witness certainty is a factor bearing on the accuracy of an identification that juries should consider.

The sooner we reexamine this issue, the better—for law enforcement, for criminal defendants, and for society at large. "Accurate eyewitness identifications may aid in the apprehension and prosecution of the perpetrators of crimes. However, inaccurate identifications may lead to the prosecution of innocent persons while the guilty party goes free." (Identifying the Culprit, *supra*, at p. 9, fn. omitted; see *State v. Delgado* (2006) 188 N.J. 48 [902 A.2d 888, 895] ["Eyewitness identification can be the most powerful evidence presented at trial, but it can be the most dangerous too."].) Indeed, mistaken eyewitness identifications have played a role in a substantial number of wrongful convictions and unsolved crimes. (Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong (2011) p. 48 [finding that 190 of the first 250 inmates exonerated by DNA testing since 1989 were misidentified by an eyewitness].) This issue deserves our careful attention, for "[a]t stake is the very integrity of the criminal justice system and the courts' ability to conduct fair trials." (*Henderson, supra*, 27 A.3d at p. 879.)

### III.

Finally, today's opinion holds that the trial court did not err when it admitted the stun gun evidence from the incident at Rod's Coffee Shop as probative of Sánchez's identity as the person who used the stun gun during the Casa Gamino robbery. (Maj. opn., *ante*, at p. 452.) But it is not clear to me that use of a stun gun is " 'so unusual and distinctive as to be like a signature' " relevant to proving identity. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) Instead of deciding whether the

trial court erred, I would find that any error was harmless beyond a reasonable doubt in light of the trial testimony of Armando Lopez and Javier Lopez, both of whom identified Sánchez as the stun gun user.

Apart from the issues discussed above, I join the opinion of the court.

Appellant's petition for a rehearing was denied August 17, 2016.